# United States Court of Appeals
## For the First Circuit

No. 22-1117

ANTHONY GATTINERI,

Plaintiff, Appellant,

v.

WYNN MA, LLC; WYNN RESORTS LIMITED,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Gelpí, Circuit Judges.

Stephen F. Gordon, with whom Todd B. Gordon, Robert A. DiSorbo, Kevin A. Robinson, and The Gordon Law Firm LLP were on brief, for appellant.
Samuel M. Starr, with whom Caitlin A. Hill and Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C. were on brief, for appellees.

March 22, 2023

**GELPÍ, Circuit Judge.** The appeal before us asks that we opine on a topic that raises important questions of Massachusetts state law and public policy: the regulation of gambling licenses in the Commonwealth. The story begins with an option contract for the purchase of land for the construction of the Encore Boston Harbor resort and casino in Everett, Massachusetts (owned by Wynn MA, LLC, which, in turn, is wholly owned by Wynn Resorts, Limited). The contract, between Encore and FBT Realty, LLC ("FBT"), of which Appellant Anthony Gattineri ("Gattineri") is a 46.69% owner, gave Encore the option to purchase the land from FBT for $75 million should the Massachusetts Gaming Commission ("Commission") grant Encore a gaming license. After some back and forth, the Commission ultimately conditioned the grant of the license on a $35 million purchase price for the sale of the land (a $40 million reduction from the original agreed-upon amount) and signed certification by each member of FBT that they were the sole owners of the company (after concerns were raised that someone with a criminal background also had an ownership interest in FBT). All FBT members signed the required certification, except Gattineri, who for months refused to sign. In June 2014, however, a representative for Wynn MA, LLC and Wynn Resorts, Limited (together, "Wynn Defendants") allegedly presented him an offer: Wynn Defendants would "make him whole" if he signed the certification. Gattineri ultimately accepted the offer (in an

- 2 -

alleged contract we term the "San Diego Agreement") and executed the required certification, and Wynn Defendants obtained the license; but, according to Gattineri, he was never "made whole."

Gattineri consequently sued Wynn Defendants in the U.S. District Court for the District of Massachusetts, alleging (1) breach of contract, (2) common law fraud, and (3) unfair and/or deceptive trade practices in violation of state law. Wynn Defendants sought summary judgment, which the district court granted on all counts, finding, among other things, no valid or enforceable contract. Gattineri appeals, raising a number of alleged errors. We reject flatly two arguments of error he makes. As to his claim of improper ex parte communication, he has failed to show any prejudice stemming from the communications between the district court's clerk and the defendants. As to his claim that the doctrine of in pari delicto defeats Wynn Defendants' arguments based on illegality, we reject the argument. We do find that some of the alternative grounds on which the district court granted summary judgment to Wynn Defendants do not justify entry of summary judgment because they implicate genuine disputes as to material facts. As to the core argument by Wynn Defendants (which affects all claims) that the San Diego Agreement is unenforceable as contrary to state law and/or as a violation of public policy, we conclude those questions are best certified to the Massachusetts Supreme Judicial Court ("SJC").

- 3 -

## I. Background

The civil appeal before us involves a dispute arising out of the sale of a tract of land in Everett and Boston (the "Parcel") for the construction of the Encore Boston Harbor. Before the resort and casino was built, the Parcel was owned by FBT, a limited liability company owned by Paul Lohnes, The DeNunzio Group, LLC (owned by Dustin DeNunzio, Manager of FBT), and Appellant Gattineri.

We rehearse the facts, which are undisputed, unless otherwise noted, as the district court found them and in the light most favorable to the non-moving party, Gattineri. Thompson v. Gold Medal Bakery, Inc., 989 F.3d 135, 138 (1st Cir. 2021).

### A. Facts

1. Parties and Relevant Non-Parties

We begin by outlining the players in this suit. Appellee Wynn MA, LLC is a Nevada limited liability company -- wholly owned by its sole member, Appellee Wynn Resorts, Limited -- with a principal place of business in Nevada. Wynn Resorts, Limited is a publicly traded Nevada corporation also with a principal place of business in Nevada. Wynn MA, LLC owns the Encore Boston Harbor. In January 2013, Encore filed for a Region A Category 1 gaming license to operate a resort in Massachusetts with the Commission, as required by state law.

Robert DeSalvio joined Wynn Resorts Development, LLC as Senior Vice President of Development in March 2014.[1] He reported to Matthew Maddox, Chief Financial Officer, and Kim Sinatra, Senior Vice President and General Counsel, both at Wynn Resorts, Limited.

2. FBT Membership Concerns

During the licensing process, the Commission became troubled by FBT's membership makeup at the time of the Option Agreement, discussed infra. According to FBT, FBT was owned only by Gattineri, who held a 46.69% ownership interest; DeNunzio; and Lohnes. However, the Commission expressed concerns that Charles Lightbody, a convicted felon and associate of La Cosa Nostra, might have had an ownership interest in FBT.

The Investigations and Enforcement Bureau ("IEB") of the Commission, which conducts suitability investigations of all applicants for gaming licenses, conducted such an investigation of FBT and Wynn MA, LLC. On July 10, 2013, Massachusetts State Police officers interviewed Gattineri about his membership, and on August 1, 2013, Kevin Tourek, Compliance Officer at Wynn Resorts, Limited, sent a letter to DeNunzio stating:

> Certain regulatory concerns have been expressed with respect to the ownership of [FBT]. On January 17, 2013, you advised Kim Sinatra in writing that the sole equity owners of FBT were yourself, Paul Lohnes and Anthony Gattineri. Can you please confirm any other

---

[1] DeSalvio became Encore's President in March 2018, years after the alleged San Diego Agreement took place.

- 5 -

direct or indirect equity participants since FBT took title to the property, indicating the period of ownership of each person?  We would appreciate your response on or before August 10, 2013.

A few days later, DeNunzio replied:

I write in response to your letter dated August 1, 2013.  On October 9, 2009, [FBT] was organized by the filing of a Certificate of Organization with the Massachusetts Secretary of State.  On October 15, 2009, FBT recorded the deed to the Everett property.  The direct or indirect ownership of FBT since FBT took title is as follows:  The owners of FBT in 2009 and 2010 were Paul Lohnes, Anthony Gattineri, Gary DeCicco and Charles Lightbody.  In 2011, The DeNunzio Group, LLC became an additional owner of FBT.  Dustin DeNunzio is the 100% owner of The DeNunzio Group, LLC.  Gary DeCicco agreed to relinquish the extent of his ownership interest in FBT in early 2012.  Prior to the execution of the [O]ption [A]greement with Wynn on December 19, 2012, Charles Lightbody also agreed to transfer all of his ownership interest in FBT to Anthony Gattineri.  Since before December 19, 2012, and through the present, the sole equity owners (direct or indirect) of FBT have been Paul Lohnes, Anthony Gattineri and The DeNunzio Group, LLC.

On September 5, 2013, Gattineri was served with a subpoena for testimony and records relating to the interest in FBT between him and Lightbody, and on October 15, 2013, Gattineri asserted his Fifth Amendment rights when the IEB attempted to interview him. Gattineri states that he obtained Lightbody's 12.05% membership interest in FBT via a Memorandum of Transfer and Promissory Note for $1.7 million.

On December 6, 2013, the IEB issued its Suitability Report, which set forth "the findings of fact relative to [the suitability] investigation" and included "concerns regarding the sellers of the property for the proposed casino site."

3. The Parcel

The Parcel at issue was the subject of an Option Agreement signed by Encore, represented by Maddox, and FBT on December 19, 2012. Through this agreement, Encore received the option to purchase the Parcel from FBT for $75 million. FBT was required to cooperate in the casino-licensing process: "Seller and its Affiliates shall, at their sole cost and expense, reasonably cooperate with Purchaser with respect to any information it reasonably requires to complete the Casino Application and respond to any such inquiries throughout the licensing process." "Affiliate" was defined as "any Person, any other Person which, directly or indirectly, Controls, is Controlled by, or is under common Control with, such original Person." The Option Agreement further provided:

> Seller represents and warrants to Purchaser that Seller and, to the best of Seller's knowledge, all Persons associated with Seller are willing to file all necessary applications to obtain whatever Approvals from the Gaming Regulatory Agencies may be required of such Persons in connection with this Agreement. To the best of Seller's knowledge, neither Seller nor any Person associated with Seller has ever engaged in any conduct or practices which any of the foregoing Persons should reasonably

- 7 -

believe would cause such Person to be denied any such Approvals.

"Approvals" was defined as:

> [A]ll approvals, consents, licenses, permits, authorizations, orders, franchises, accreditations, certificates, variances, declarations, concessions, entitlements, waivers, exemptions waivers and similar items, including, without limitation, any license or approval under M.G.L. Chapter 91, a determination under the Massachusetts Environmental Policy Act ("MEPA"), or an Army Corp of Engineer's Permit under the Federal Clean Water Act.

Because the Parcel required environmental remediation at the time that Encore and FBT entered into the agreement, the Option Agreement also required FBT to complete environmental cleanup activities, termed the "Seller's Environmental Obligations." As outlined by the district court,

> the Option Agreement required[:] (1) Seller to diligently pursue, at the Seller's sole expense, a "Permanent Solution to any Releases of Oil and Hazardous Material at and From the Property" as soon as possible prior to closing; (2) Seller to reimburse Purchaser for reasonable out-of-pocket costs in the event of the Seller's breach; and (3) both parties to come to a mutually acceptable cost-sharing agreement related to the sharing of "any incremental costs" resulting from any releases of oil and hazardous material from the property.

Gattineri v. Wynn MA, LLC, No. CV 18-11229-FDS, 2022 WL 123892, at *3 (D. Mass. Jan. 13, 2022).

- 8 -

However, on November 11, 2013, because, according to DeNunzio, the parties could not agree on a "mutually acceptable Environmental Cost-Sharing Agreement," DeNunzio emailed Jacqui Krum, Senior Vice President at Wynn MA, LLC, announcing the "termination of the Option Agreement." It should be noted that Gattineri was copied on several emails negotiating the environmental clean-up obligations. On November 15, 2013, Gattineri informed his personal attorney, Daniel Doherty, that he "ha[d] no intention of cost sharing 30,000,000 [sic] for clean up because they want to disturb waterside . . . . Wynn and us are not anywhere near on the same page . . . ."

4. The Ninth Amendment to the Option Agreement

As negotiations regarding FBT's environmental remediation obligations continued, on November 21, 2013, Paul Feldman, FBT's attorney, emailed Wynn Defendants the following offer: "Price is reduced to $31 million; Wynn takes over 100% of environmental and receives an assignment of the Pharmacia Judgment [a court judgment concerning environmental cleanup responsibilities]." Per DeNunzio, FBT and Wynn MA, LLC did not agree on FBT's environmental remediation obligations -- including how the Pharmacia Judgment would be allocated -- in the original Option Agreement and thus could not quantify the amount.

As a result of these discussions, on November 26, 2013, Encore and FBT entered into a Ninth Amendment to the Option

- 9 -

Agreement providing that (1) both parties agreed "to amend the Agreement on the terms and conditions set forth below including, without limitation, to reduce the Purchase Price" to $35 million; (2) "[i]n all events [FBT's] monetary obligation for the Phase III Scope of Work shall not exceed" $10 million, meaning that $10 million of the purchase price would be set aside to pay for the Seller's environmental obligations and certain reports required by the Massachusetts Department of Environmental Protection; and (3) should FBT complete any of the work outlined in another section of the agreement prior to closing, the $10 million should be reduced as such. Gattineri did not sign the Ninth Agreement -- since he disagreed with the $40 million price reduction -- but could not prevent FBT from entering into the agreement.

5. The Commission's Approval of the Ninth Amendment

On December 5, 2013, Wynn MA, LLC submitted a petition to the Commission requesting review of their "proposed resolution to concerns raised by the [IEB] . . . about undisclosed interests in FBT," stating in part:

> 5. Wynn commissioned an appraisal of the fair market value of the Property with the following assumptions: (i) that the Property would not be used for gaming purposes and (ii) that the environmental condition of the Property would be suitable for general commercial use. Based on the foregoing assumptions, the appraisal valued the Property at [$35 million].

- 10 -

6. Wynn and FBT amended the Option Agreement to reduce the Purchase Price to [$35 million], the appraised value of the Property based upon the relevant assumptions.

7. With respect to the required environmental remediation, Wynn and FBT agree that environmental remediation necessary to bring the Property into regulatory compliance and make the Property suitable for general commercial purposes is approximately [$10 million]. Therefore, pursuant to the terms of the revised Option Agreement, if Wynn exercises the option, Wynn will deposit [$10 million] of the Purchase Price into an escrow account to be used for Phase III environmental remediation. To the extent that the actual amount of the Phase III remediation is less than [$10 million], any remaining amounts will be paid to FBT.

Consequently, the Commission held a public hearing to consider the proposal and approved the new $35 million purchase price:

COMMISSIONER MCHUGH: All right. So then, I move that the [C]ommission accept the resolution proposed by Wynn Mass to the issues that arose out of the land transaction about which we've heard today, with the essential ingredients that were outlined.

That is that the sale price be 35 -- no more [than] $35 million with the $10 million proviso for cleanup cost, net -- net of the $10 million or whatever portion of that needs to be spent on -- on cleanup costs, number one.

Number two, that the three members of FBT, LLC, who are nominally going to receive the proceeds be required to sign a document saying that they are the exclusive recipients of the proceeds, and that they do that on a notarized document under oath.

Moreover, the Commission directed the IEB "to deliver its entire file . . . to the U.S. attorney, the district attorney for Suffolk County, and the attorney general."  Gattineri learned of the Commission's decision, including the condition that all three FBT members sign a document under oath (the "Certificate") confirming that they would be the exclusive recipients of the proceeds, on December 13, 2016, from his personal attorneys, Jeffrey Doherty and Bradford Bailey.  While Lohnes and DeNunzio signed the Certificate on December 23, 2013, stating the following, Gattineri refused to do so:

> The undersigned, being duly sworn, state and reaffirm, that to the best of their knowledge, the Representations of Seller set forth in Section 5 of the Ninth Amendment to Option Agreement dated November 26, 2013, by and between FBT Everett Realty, LLC, a Massachusetts limited liability company ("Seller") and Wynn MA, LLC, a Nevada limited liability company ("Purchaser") as follows:
>
> 5. Representations of Seller.  To induce Purchaser to execute, deliver and perform its obligations under the Agreement, Seller hereby represents the following on and as of the Amendment Effective Date and on and as of the Closing Date:
>
> Schedule 3 [listing Lohnes, Gattineri, and The DeNunzio Group, LLC] is a true and accurate list of (i) each person with a legal or beneficial ownership interest direct or indirect, in Seller (a "Beneficiary"), (ii) the percentage interest in Seller of each such Beneficiary, and (iii) the address of each Beneficiary.  Neither Seller nor any Beneficiary has made, or has any agreement whether oral or written to make any payments

- 12 -

to any other person or entity from the proceeds of the Agreement including, without limitation, any of the option payments made pursuant to Section 2.2 or any portion of the Purchase Price.

6. Ongoing Negotiations with Gattineri

Gattineri remained steadfast in his refusal to sign the Certificate unless he was compensated, which became an issue for Wynn Defendants, who required his signature to obtain the gaming license.

On January 24, 2014, Feldman, FBT's counsel, forwarded an email from Doherty, Gattineri's personal counsel, to Wynn representatives, outlining Gattineri's interests:

> I have talked with Anthony. He still wants to be bought out permanently at his share of $75,000,000. The cram down to FMV has him entrenched. He thinks FBT has been played. I can't disagree with him. If the GC wants his signature, then the deal goes back to $75,000,000. They can't have it both ways. Whether you agree with him or not, doesn't matter. That is what he wants.

Among the recipients was Steve Tocco, one of Wynn Defendants' outside consultants.

According to Gattineri, from March 2014 to June 2014, Wynn Defendants, primarily via DeSalvio, their representative, engaged him in a series of negotiations to obtain his signature. On April 14, 2014, he met with DeSalvio and Tocco for the first time. DeSalvio informed him that he had been tasked with obtaining his signature. On April 15, 2014, he spoke to DeSalvio over the

- 13 -

phone to discuss his share of the $40 million price reduction. On April 18, 2014, Gattineri, DeSalvio, Tocco, and Doherty again met and discussed the Certificate and Gattineri's share of the $40 million price reduction. A month later, on May 17, 2014, Gattineri spoke to DeSalvio over the phone about the Certificate. A few weeks later, on June 6, 2014, Gattineri again met with DeSalvio, Tocco, and Doherty to discuss the Certificate and Gattineri's share of the $40 million price reduction. Gattineri again refused to sign unless he was paid his percentage of the price reduction.

### 7. The Alleged San Diego Agreement

Finally, on June 14, 2014, Gattineri met with DeSalvio at the Westgate Hotel in San Diego, California, where they allegedly verbally agreed to the San Diego Agreement. Gattineri contends that after DeSalvio represented that he had authority to enter into an agreement with him, they agreed to the following: "If Anthony Gattineri signed the required [C]ertificate and Wynn obtained the casino license for a casino on the FBT property, Wynn would 'make Anthony Gattineri whole.'" Per Gattineri, "making him whole" would involve Wynn paying him approximately $19 million:

> Q. Did you and Mr. DeSalvio talk about a particular amount?
>
> A. I think I said it was around $19 million or 19 million. I didn't know the exact dollar.
>
> Q. How did you make the calculation?

- 14 -

A. Well, I took the $75 million, and I multiplied it, obviously, by around 48 percent, and I came up with around 18 and a half, $19 million.

Q. Did you have a specific amount that you and Mr. DeSalvio had discussed?

A. Not to the penny.

Q. To the dollar?

A. I think what I said, it was around $19 million or that comment.

According to Gattineri, the $19 million calculation was his 46.69% portion of the $40 million reduction -- $18,676,000 -- not taking into account FBT's environmental-cleanup obligation under the original Option Agreement:

Q. And -- and how were you going to calculate what that means to make you whole? What -- what were you going to do?

A. I would probably just do some simple math and have someone with a better math background than I am, I'm not very good with math. And calculate the, whatever, the 46.7 at $75 million and that's what I'm owed. That's what I need to make me whole.

Q. What adjustment would you make for the seller's obligation under the original option agreement to perform environmental work?

A. I wouldn't be doing any of that. I think -- I think Wynn -- I think Wynn knew the environmental issue. I don't really know what they were doing with Monsanto and the agreements they were making. I have no idea.

- 15 -

Q. You have no idea what obligations FBT assumed under the original option agreement for seller's environmental clean up?

A. I don't recall if, if we were responsible for any of it or it was -- it seemed like it. I have no idea how much the money was.

Gattineri further specified that this was not the only way to make him "whole," rather:

Q. That was one of the ways to make you whole would be that Wynn possibly would buy real estate that you had an interest in?

A. Yeah, they have a real estate division under some development company that they could do it that way.

Q. So they could buy the property?

A. I don't know how they do. They know how to do it they said.

Q. Is that one of the things that you and Mr. DeSalvio talked about, the possibility that after you got cleared of the investigation that if you had other real estate in the greater Boston area perhaps Wynn could become a purchaser of that real estate; is that something you guys talked about in San Diego?

A. We talked about it at different times. If I was cleared and found 100[%] exonerated and not guilty, you could definitely get something done.

Q. And one of the ways to get something done might have been that Wynn could buy some property that you had for sale in the area?

A. Very possibly be that. That would be up to them. They have all kinds of ways to do it.

- 16 -

On June 14, 2014, a few hours after his meeting with DeSalvio, Gattineri signed the Certificate. Four days later, Doherty sent the Commission a copy of the Certificate. In September 2014, the Commission granted Encore the gaming license, leading to the purchase of the Parcel for $35 million. Gattineri did not receive the $19 million that he claims he is owed.

8. Gattineri's Indictments

On October 1, 2014, Gattineri, DeNunzio, and Lightbody were indicted in the U.S. District Court for the District of Massachusetts for wire fraud and conspiracy to commit wire fraud; more specifically, for conspiring to defraud Wynn Defendants and the Commission by covering up Lightbody's financial interest in the Parcel. Id. at *8. A couple of weeks later, Gattineri was indicted in Massachusetts state court for impeding a gaming investigation, conspiracy, and tampering with evidence. Id. However, Gattineri was acquitted of all federal charges on April 29, 2016, following a jury trial, and his state-court case ended when the prosecution entered a nolle prosequi on September 29, 2016. Id.

9. The Chapter 93A Demand Letter

In April 2018, Wynn Defendants received a demand letter from Gattineri's attorneys alleging that they had violated Massachusetts General Laws Chapter 93A by engaging in "unfair

- 17 -

and/or deceptive trade practices" and had breached the following contract with Gattineri:

> [O]n June 14, 2014 . . . Wynn, through its duly authorized representative Robert DeSalvio, offered Anthony Gattineri to "make him whole" on Anthony Gattineri's loss of $18,676,000 (46.69% of $40 million) if
>
> (a) Anthony Gattineri signed a Certificate that Wynn needed to present to the Massachusetts Gaming Commission . . . in order for Wynn to obtain a casino license for the FBT property in Everett . . . upon which Wynn had an Option to Purchase; and
>
> (b) So long as Anthony Gattineri had committed no crime in connection with the sale of the FBT Property to Wynn.

In June 2018, Gattineri filed this suit against Wynn Defendants alleging (1) breach of contract; (2) common law fraud; and (3) unfair and/or deceptive trade practices in violation of Chapter 93A, section 11 of the Massachusetts General Laws, arguing that Wynn Defendants "fail[ed] to make him whole" because they did not pay him "his 46.69% share of the $40 million price reduction windfall that [they] received" and seeking nearly $19 million in damages.

10. The District Court's Communication with Wynn Defendants

During the course of the suit, Wynn Defendants filed a motion for summary judgment. In support thereof, they included (1) a memorandum of law, (2) a statement of undisputed material facts, and (3) a declaration containing forty exhibits. Included

- 18 -

in these exhibits were Exhibit 16, containing excerpts of the December 12, 2019 deposition of Daniel Doherty, and Exhibit 38, containing excerpts of the October 23, 2020 deposition of Gattineri. The statement of undisputed material facts included a paragraph stating, "Mr. Gattineri did not agree to sign the Certificate during the breakfast meeting in San Diego, but a few hours after the San Diego Meeting, Mr. Gattineri notified Mr. DeSalvio that he would sign the Certificate." The statement cited page 73 of Volume II of Gattineri's deposition (Exhibit 38); however, that specific page was left out of Exhibit 38. About a month later, Gattineri filed an opposition to the motion for summary judgment, a statement of material facts in dispute, and thirty-three additional exhibits. While Gattineri's Exhibit 2 contained counter-designated excerpts from Gattineri Volume II, he did not include page 73 from Gattineri Volume II as part of Exhibit 2, nor did he dispute or object to Wynn Defendant's citation to page 73 in his statement of material facts in dispute. As such, no party filed full transcripts of Gattineri Volume II. Shortly thereafter, Wynn Defendants filed their reply, and a hearing on the motion for summary judgment was held on December 23, 2020.

Although not reflected in the district court docket, a year later, the district court courtroom clerk emailed Wynn

- 19 -

Defendants' counsel, without including Gattineri's counsel, the following:

> The law clerk for the judge was wondering if they could have a copy of the entire deposition from exhibit 16 [Daniel Doherty's deposition] on D. 135. As well as Gattineri Vol II transcript which I believe is Exhibit 38. You can email it to me by pdf if that works. Your help is much appreciated.

Consequently, Wynn Defendants' counsel replied with the requested exhibits (Exhibit 16 and 38). At this point, Gattineri's counsel was unaware of this communication.

In January 2022, the district court granted summary judgment on all three counts in favor of Wynn Defendants. The grant cited four pages of Gattineri Volume II (page 32, 73, 112, and 113), all of which were cited in Wynn Defendants' statement of undisputed material facts and were included in Exhibit 38, except page 73. Id. at *7-8. The text accompanying the citation to page 73 read: "Gattineri did not agree to sign the Certificate during the meeting in San Diego. However, a few hours after the meeting, he notified DeSalvio that he would sign the Certificate. (Gattineri Dep. Tr. II:73; Hill Dec. Ex. 5, DeSalvio Dep. Tr. 76)." Id. at *8.

Thereafter, Gattineri filed this appeal. While amassing the contents of the joint appendix for appeal, Gattineri's counsel learned of the email string between the courtroom clerk and Wynn

Defendants' counsel and that the full transcripts of the two depositions had been provided to the district court.

## B. Procedural History

As aforementioned, the district court ultimately granted summary judgment in favor of Wynn Defendants and concluded that (1) the alleged San Diego Agreement constitutes an "unenforceable illegal contract" under Chapter 23K of the Massachusetts General Laws; (2) an essential term of the alleged San Diego Agreement -- the amount Gattineri would be paid in exchange for his signature -- was too indefinite and uncertain to form a valid contract; (3) Gattineri's supposed reliance on Wynn Defendants' representations was too unreasonable, foreclosing a claim for common law fraud; and (4) Gattineri's Chapter 93A claim was barred because it is "wholly derivative" of his breach-of-contract and common-law fraud claims. Id. at *10, 13, 14. This timely appeal followed.

## II. Discussion

On appeal, Gattineri requests reversal based on an alleged taint caused by the ex parte communication between the district court courtroom clerk and Wynn Defendants' counsel and contends that the district court erred in granting Wynn Defendants' motion for summary judgment. We ultimately reject Gattineri's improper ex parte communication claim and in pari delicto argument, conclude that there are genuine disputes of material facts related

to his contract and fraud claims, and finally determine that whether Gattineri's claims can succeed hinges on whether the San Diego Agreement is unenforceable as contrary to state law and/or as a violation of public policy. Because the enforceability of the agreement is dispositive of this case, we certify the questions outlined below to the SJC.

## A. Alleged Taint

We begin with the claim regarding the alleged taint. Gattineri contends that the district court courtroom clerk's communication with Wynn Defendants' counsel violated the prohibition on ex parte communications in Canon 3(A)(4) of the Code of Conduct for United States Judges and that the district court's citation to page 73 provides adequate proof to warrant reversal. Wynn Defendants counter that reversal is not required because the communication was purely administrative and did not provide any procedural, substantive, or tactical advantage to Wynn Defendants, and because Gattineri has not pointed to any prejudice suffered. We agree with Wynn Defendants that Gattineri has utterly failed to show prejudice.

Canon 3(A)(4) prohibits ex parte communications except for "scheduling, administrative, or emergency purposes" so long as the "communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of" said

communication. Code of Conduct for U.S. Judges, Canon 3(A)(4).

While Gattineri argues that the communication runs afoul of the canon, it simply "makes no difference on . . . appeal whether the district court violated the pertinent canon unless that violation somehow could have tainted the judgment from which [Gattineri] appeals," Law Offs. of David Efron v. Matthews & Fullmer L. Firm, 782 F.3d 46, 55 (1st Cir. 2015), and he has failed to make such a showing here.

The information taken from these documents ("Gattineri did not agree to sign the Certificate during the meeting in San Diego. However, a few hours after the meeting, he notified DeSalvio that he would sign the Certificate.") does not play a significant role in the arguments now before us and was previously included in Wynn Defendants' statement of undisputed facts, which Gattineri at no point challenged. See L.R., D. Mass. 56.1 ("Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."); Schiffmann v. United States, 811 F.3d 519, 525 (1st Cir. 2016) (noting non-movant's failure to challenge fact means fact is "deemed admitted"). Neither party disputes that Gattineri originally refused to sign the Certificate, nor that he later agreed to do so. Even if we were to consider the full transcript

of both depositions substantively, Gattineri leaves us to guess as to how they might have provided a "procedural, substantive, or tactical advantage" to Wynn Defendants, especially where the district court cited only to a single page.  See, e.g., Law Offs. of David Efron, 782 F.3d at 55 (rejecting a claim of prejudice where the appellant "point[ed] to no . . . plausible [taint due to an ex parte communication], and instead merely assert[ed] in a conclusory form that such a supposed violation infringed on his due process rights").  We refuse to do such guesswork.

Gattineri also argues that the district court must have conducted and been influenced by an "apparently negative[] review" of the emailed material because, in denying a motion by Wynn Defendants to strike portions of an affidavit submitted by Gattineri during summary judgment briefing, the court "expressed a 'serious question concerning [Mr.] Gattineri's credibility.'" (Alteration in original.)  This argument takes the district court's statement out of context.  Wynn Defendants' motion to strike invoked the "sham affidavit rule," seeking to strike portions of Gattineri's affidavit that were allegedly contradicted by statements Gattineri had made in his deposition.  See, e.g., Escribano-Reyes v. Pro. HEPA Certificate Corp., 817 F.3d 380, 386 (1st Cir. 2016) (explaining "sham affidavit rule" prohibits a party from creating conflict and resisting summary judgment with an affidavit that contradicts its unambiguous responses to questions

asked during discovery).  The "credibility" language Gattineri quotes in his brief appeared in the district court's discussion of a specific "discrepancy" between Gattineri's deposition testimony and his summary judgment affidavit that, the court concluded, "raise[d] a serious question concerning Gattineri's credibility" but did not warrant striking the relevant part of the affidavit. The court did not express a generalized concern about Gattineri's credibility or reference the deposition materials introduced through the ex parte communication.  Nothing in the district court's reasoning suggests that those materials played any role in its decision on the motion, which was favorable to Gattineri.

Because Gattineri has failed to show prejudice, his claim fails.

**B. Breach of Contract**

Having rejected Gattineri's improper ex parte communication claim, we next turn to Gattineri's breach of contract argument.

"We review a district court's grant of summary judgment de novo." Triangle Cayman Asset Co. v. LG & AC, Corp., 52 F.4th 24, 32 (1st Cir. 2022).  Summary judgment "is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Id. (quoting Fed. R. Civ. P. 56(a)).  A genuine dispute is one that "would permit a rational factfinder to resolve the issue in favor of

either party," and a material fact is one that has the "potential to affect the outcome of the suit under the applicable law." Joseph v. Lincare, Inc., 989 F.3d 147, 157 (1st Cir. 2021) (first quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990); and then quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017)). We further "draw[] all reasonable inferences in favor of the non-moving party," here, Gattineri. Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018) (quoting Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013)).

In federal diversity cases, state law supplies the substantive rules of decision, and the parties agree that Massachusetts law controls. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); see also Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) ("It is settled in this circuit that when the parties have reached a plausible agreement about what law governs, a federal court sitting in diversity jurisdiction is free to forgo independent inquiry and accept that agreement.").

In granting summary judgment in favor of Wynn Defendants, the district court found that the alleged San Diego Agreement is unenforceable because (1) it is an "illegal contract," and, "even if it were not," (2) "the terms are not sufficiently definite or certain to form the basis of a valid contract." Gattineri, 2022 WL 123892, at *10. As to the legality

of the contract, it is unclear as a matter of law whether the contract is indeed illegal because that matter rests on unresolved issues of Massachusetts law. Since we cannot determine whether the contract is enforceable, we certify these issues to the SJC. See infra II.F. As to the validity of the contract, we agree with Gattineri that one of the grounds on which the district court relied in granting summary judgment -- Wynn Defendants' argument that the contract was not sufficiently definite or certain -- was legally insufficient because there are material facts in genuine dispute.

To put forth a viable breach of contract claim under Massachusetts law, Gattineri "must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and [he] sustained damages as a result of the breach." Brooks v. AIG SunAmerica Life Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007). A valid contract exists where all the essential terms are "definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined." Cygan v. Megathlin, 96 N.E.2d 702, 703 (Mass. 1951) (emphasis added).

At the summary judgment stage and on appeal, Wynn Defendants dispute whether a valid contract existed, arguing that they are entitled to summary judgment on the contract claim because "a material term in the alleged San Diego Agreement -- the amount

- 27 -

that would make [Gattineri] 'whole' -- is indefinite and uncertain." Gattineri counters that prior to the San Diego Agreement, Wynn Defendants were well aware that the amount that would "make him whole" was his percentage (46.69%) of the price reduction ($40,000,000), in essence, $18,676,000. The district court disagreed with Gattineri, finding the alleged agreement vague since "there is no evidence that [Gattineri] and DeSalvio even discussed" what it would mean to "make him whole" and "Gattineri . . . testified that he did not know how the price would be adjusted to take into account the environmental-cleanup obligation that FBT had under the original Option Agreement." Gattineri, 2022 WL 123892, at *12. On appeal, Gattineri claims that the record does not support such a finding. Viewing the record in the light most favorable to Gattineri, as we do at the summary judgment stage, we conclude that Gattineri has enough evidence to persuade a reasonable jury that "making him whole" had a definite meaning because (1) the only material term, the approximately $18,676,000 that would make Gattineri "whole," was definite and certain and (2) the parties negotiated with the understanding that the environmental cleanup costs would not factor into this calculation.

First, the record contains evidence via affidavit, deposition, and email tethering "making Gattineri whole" to his percentage of the price reduction such that a reasonable factfinder

could conclude that "making Gattineri whole" had a definite meaning. For instance, in Gattineri's affidavit -- accompanying his opposition to Wynn Defendants' summary judgment motion -- he states that in the months preceding the alleged San Diego Agreement, he met with DeSalvio multiple times and expressed his "desire to be made whole on [his] percentage of the $40 [m]illion price reduction." (Emphasis added.) On April 15, 2014, "DeSalvio called [Gattineri] to discuss the Certificate and [his] share of the $40 million price reduction." (Emphasis added.) Three days later, another meeting was held where Gattineri "made it clear . . . that [he] would not sign anything unless [he] was made whole on [his] percentage of the price reduction." (Emphasis added.) About a month later, Gattineri and DeSalvio again spoke about the Certificate. A few weeks later, Gattineri again refused to sign the Certificate "unless [he] was made whole on [his] percentage of the $40 [m]illion price reduction." (Emphasis added.) Further, Wynn Defendants were aware of this percentage since FBT's counsel forwarded to Wynn representatives an email from Gattineri's personal counsel to FBT's counsel stating that Gattineri "still wants to be bought out permanently at his share of $75,000,000." While DeSalvio, who had been in alleged negotiations with Gattineri, was not copied on this email, Tocco, who had accompanied DeSalvio to meetings with Gattineri on at least three occasions, was copied. This supports a reasonable inference

- 29 -

that DeSalvio knew the amount that would "make Gattineri whole" either because the parties discussed that figure at the meetings that Tocco attended or because Tocco knew and told DeSalvio.

While Wynn Defendants would have us believe that the alleged San Diego Agreement was reached in a vacuum and hence that the amount that would "make Gattineri whole" was not certain, taking the evidence in the light most favorable to Gattineri, the series of conversations that led to Gattineri's signature suggest otherwise. See Simons v. Am. Dry Ginger Ale Co., 140 N.E.2d 649, 652 (Mass. 1957) (finding essential terms sufficiently definite in part because "[t]he parties had been engaged in dealings with each other over a considerable period of time"). Given Wynn Defendants' dire need to secure Gattineri's signature and the number of conversations that led up to the alleged San Diego Agreement, a reasonable factfinder could conclude that the parties were clear on what it would take to "make Gattineri whole."

Wynn Defendants contend that the amount was undefined because when Gattineri was asked, in his deposition, whether he and DeSalvio had discussed a "specific" amount that he would need in exchange for his signature, he stated that they had not discussed a figure "to the penny." But Gattineri also provided evidence in his deposition that he and DeSalvio had discussed the amount necessary to "make him whole" in terms of the percentage of the price reduction -- a concrete, readily calculable figure --

and calculated that amount to be "around $19 million." See id. ("[A] contract is not to be held unenforceable 'if, when applied to the transaction and construed in the light of the attending circumstances,' the meaning can be ascertained with reasonable certainty."). Moreover, Wynn Defendants were in receipt of the email from Gattineri's personal counsel specifying that he sought "his share of $75,000,000." Taken together, these pieces of evidence could lead a reasonable factfinder to conclude that "making Gattineri whole" had a definite meaning.

Second, Wynn Defendants argue that the alleged San Diego Agreement is also "indefinite and uncertain" because a second material term was unknown: "the cost of FBT's environmental cleanup obligations, a cost which would have reduced the amount that FBT would have received under the original Option Agreement and was, according to FBT's Manager, never quantified." But even if the term was unknown, the record reveals that Gattineri and DeSalvio did not consider this cost in negotiating the amount needed to "make him whole." As Gattineri argues, they could not have since DeSalvio was unaware of these obligations. According to his deposition, DeSalvio had never seen the Option Agreement, much less read it, and only learned of the Certificate requirement and the $40 million reduction "[f]rom a meeting with Kim Sinatra." If DeSalvio was unaware of the Option Agreement's contents, and thus FBT's environmental obligations, he could not have had this

quantity in mind during his many negotiations with Gattineri. Wynn Defendants do not dispute this argument. As such, a reasonable factfinder could conclude that the parties mutually understood the San Diego Agreement's only material term to be the amount needed to "make Gattineri whole" and as already explained, a reasonable factfinder could conclude that that amount was sufficiently definite and certain to survive summary judgment.

Wynn Defendants aptly point out that Gattineri testified that there may have been other ways to "make him whole," such as buying real estate in which he had an interest. It therefore follows, they argue, that the amount it would take to "make him whole" must be uncertain and indefinite. But this is not the only conclusion. Rather, a reasonable factfinder could conclude that the amount in real estate that Wynn Defendants would need to purchase to "make him whole" should equal his percentage of the price reduction. In other words, the amount is certain and definite -- $18,676,000 -- but the method of payment is flexible.

Thus, because there are genuine issues of material fact in dispute, we part ways with the district court's reasoning. Summary judgment may ultimately be appropriate, but we are unable to answer this question until we hear from the SJC on the certified questions we pose.

- 32 -

## C. Common Law Fraud

The district court also granted summary judgment for Wynn Defendants on Gattineri's common law fraud claim. Like Gattineri's breach of contract claim, we review the decision de novo, drawing all reasonable inferences in favor of the non-moving party, Gattineri, Trs. of Bos. Coll., 892 F.3d at 79, and because we are sitting in diversity, state law applies, Cochran, 328 F.3d at 6.

To prove a claim for common law fraud under Massachusetts law, a party must "show[] that (1) the defendant made a 'false representation of a material fact with knowledge of its falsity for the purpose of inducing [the plaintiff] to act thereon'; (2) the plaintiff 'relied upon the representation as true and acted upon it to his [or her] detriment'; and (3) such 'reliance was reasonable under the circumstances.'" H1 Lincoln, Inc. v. S. Wash. St., LLC, 179 N.E.3d 545, 560 (Mass. 2022) (alterations in the original) (quoting Rodi v. S. New Eng. Sch. of L., 532 F.3d 11, 15 (1st Cir. 2008)). Further, "the reasonableness of a party's reliance is ordinarily a question of fact for the jury." Rodi, 532 F.3d at 15. However, it "can be a question of law where the undisputed facts permit only one conclusion" such that "no rational jury could [find] reasonable reliance." Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 918 N.E.2d 36, 50 (Mass. 2009).

The district court found, as a matter of law, that Gattineri could not have reasonably relied on Wynn Defendants' representations because an essential term of the agreement -- what would "make Gattineri whole" -- was "imprecise," "undecided," and "entirely unclear." Gattineri, 2022 WL 123892, at *13. We disagree.

As discussed supra, the record contains evidence tying what would "make Gattineri whole" to his percentage of the price reduction, such that a reasonable factfinder could conclude that what would "make Gattineri whole" would be approximately $18,676,000. The fact that DeSalvio represented Wynn Defendants in the negotiations with Gattineri and was unaware that environmental cleanup costs could be factored into the final purchase price belies the district court's finding that the amount owed to Gattineri, $18,676,000, was imprecise, undecided, or entirely unclear. This is especially the case since a factfinder may consider the context surrounding a representation in determining whether a party's reliance was reasonable. See McEvoy Travel Bureau, Inc. v. Norton Co., 563 N.E.2d 188, 194 (Mass. 1990) (finding party's reliance reasonable in part given "long existing relationship between the parties"). Gattineri did not request to be "made whole" once and in a vacuum. Instead, he repeatedly linked "making him whole" with the percentage of the price reduction in the various meetings he had with DeSalvio leading up

- 34 -

to the alleged San Diego Agreement. We simply cannot ignore this context.

The district court failed to take context into consideration and instead incorrectly relied on Masingill v. EMC Corp., 870 N.E.2d 81, 91 (Mass. 2007). But Masingill is readily distinguishable. First, the alleged promise in that case contradicted the terms of a written contract. See id. at 91. Wynn Defendants have not argued that that is the case here. Second, the surrounding circumstances make the alleged promise in this case more definite than the one in Masingill. There, the plaintiff alleged that a corporation's agent had misrepresented to her that she would be "made whole" if she left her then-employer to work for a different company. See id. at 87, 91. While the SJC found the statement "too vague to support the cause of action," it underscored that in reaching this conclusion it considered the evidence in its entirety, not just that statement alone. Id. at 91 ("The evidence does not offer any definition or further explanation of the term 'make you whole' sufficiently precise to determine what the representation meant."). The SJC further noted that when Masingill was asked at trial whether the company's agent had ever "told [her] what he meant" by "make you whole," Masingill responded, "[n]o." Id. at 91 n.24. Unlike in Masingill, Gattineri repeatedly tied his percentage of the $40 million price reduction with being "made whole" and even put forth the number $19 million.

As such, a reasonable factfinder could conclude that sufficient "definition or further explanation" existed to make Gattineri's reliance reasonable.

Thus, because a reasonable factfinder could find that what would "make Gattineri whole" was sufficiently clear, the district court's entry of summary judgment for Wynn Defendants was not warranted. Again, summary judgment may ultimately be justified on this claim, but this conclusion turns on the SJC's response to the questions we certify below.

## D. Chapter 93A

As we have explained above, we differ with the district court's conclusion that the material terms of the San Diego Agreement were not sufficiently definite and certain to form the basis of a valid contract. Moreover, we certify the other grounds on which the district court determined that the San Diego Agreement is unenforceable. See infra II.F. The district court did not reject Gattineri's 93A claim on any ground that we reject at this stage; but because whether the alleged contract is unenforceable affects this claim, we await the SJC's answer to our questions before addressing it in full.

## E. In Pari Delicto

Before discussing the legality of the alleged San Diego Agreement, we first dispose of Gattineri's in pari delicto argument. He contends that even if the alleged San Diego Agreement

is illegal, it should still be enforced because the parties are not in pari delicto, or at equal fault. Instead, he argues that he is entitled to equitable relief because he was excusably ignorant of the fact that the San Diego Agreement was potentially violative of Massachusetts law and "excusable ignorance allows . . . courts to enforce a contract . . . where one party was more likely than the other to have knowledge that the contract in question was potentially violative of a statute." We are unpersuaded.

The in pari delicto defense is limited to "those situations in which (i) the plaintiff, as compared to the defendant, bears at least substantially equal responsibility for the wrong he seeks to redress and (ii) preclusion of the suit would not interfere with the purposes of the underlying law or otherwise contravene the public interest." Nisselson v. Lernout, 469 F.3d 143, 152 (1st Cir. 2006); see Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 310-11 (1985).

We reject Gattineri's arguments. Gattineri was in pari delicto with Wynn Defendants because he knew everything that he needed to know to deduce that the San Diego Agreement may violate public policy. He was aware of the Commission's decision to require the Certificate, knew the Commission was concerned about the sale of the Parcel (indeed, he was interviewed by the Massachusetts State Police and was subpoenaed for testimony before

- 37 -

the agreement was signed), understood the Commission's signature requirement was meant to assuage those concerns, recognized that the gaming industry is highly regulated, and was being advised by counsel at all pertinent steps. Taken together, this should have given Gattineri pause as to whether the San Diego Agreement would be legally enforceable. Gattineri maintains that Wynn Defendants were far more experienced in the gaming industry, and he trusted that they would negotiate an agreement that was legal, but as a sophisticated businessman who was being advised by counsel, he cannot hide behind Wynn Defendants to claim excusable ignorance. There is simply no triable issue of differential knowledge that would make the doctrine of in pari delicto applicable here.

**F. Legality of the Alleged San Diego Agreement**

Having rejected some of the alternative grounds on which the district court granted summary judgment, we next address the legality of the alleged San Diego Agreement. This question is dispositive of this suit. If the agreement violates state law or public policy, Gattineri's contract and fraud claims cannot move forward. Ultimately, we conclude that no controlling SJC precedent exists to guide our analysis and thus certify the questions outlined below to the SJC.

Under Massachusetts law, a contract is unenforceable if "illegality constitutes an essential element of the contract." Health Care Collection Servs., Inc. v. Protocare, Inc., No. CIV.

A. 92-12634-Z, 1995 WL 96911, at *2 (D. Mass. Feb. 24, 1995) (first citing Green v. Richmond, 337 N.E.2d 691, 695 (Mass. 1975), abrogated on other grounds by Wilcox v. Trautz, 693 N.E.2d 141 (Mass. 1998); and then citing Zytka v. Dmochowski, 18 N.E.2d 332, 334 (Mass. 1938), abrogated on other grounds by Wilcox, 693 N.E.2d 141). A contract can be deemed illegal if it expressly violates a statute or, even if it does not, if finding it unenforceable is "necessary to accomplish the statute's objectives." Baltazar Contractors, Inc. v. Town of Lunenburg, 843 N.E.2d 674, 677 (Mass. App. Ct. 2006); see also Serv. Emps. Int'l Union v. Dep't of Mental Health, 63 N.E.3d 1097, 1102 (Mass. 2016) ("[W]hether a contract made in violation of a statute is rendered void ab initio, i.e., treated as having no force or effect, depends upon the language of the statute and the nature of the violation.").

In other words, Massachusetts law will not enforce contracts that disregard public policy, Trs. of Cambridge Point Condo. Tr. v. Cambridge Point, LLC, 88 N.E.3d 1142, 1150 (Mass. 2018), where "public policy" "refers to a court's conviction, grounded in legislation and precedent, that denying enforcement of a contractual term is necessary to protect some aspect of the public welfare," Beacon Hill Civic Ass'n v. Ristorante Toscano, Inc., 662 N.E.2d 1015, 1017 (Mass. 1996). "The test is, whether the underlying tendency of the contract under the conditions described was manifestly injurious to the public interest and

- 39 -

welfare." Id. (quoting Adams v. East Boston Co., 127 N.E. 628, 631 (Mass. 1920)). However, "[t]he grounds for a public policy exception must be clear in the acts of the Legislature or the decisions of [a Massachusetts] court." Cambridge Point, LLC, 88 N.E.3d at 1150 (quoting Miller v. Cotter, 863 N.E.2d 537, 547 (Mass. 2007)).

Here, we are asked to determine first, whether the alleged contract violates Chapter 23K of the Massachusetts General Laws and second, if not, whether it nonetheless violates Massachusetts public policy, rendering it unenforceable. Chapter 23K sections 21(b) and (c) provide in relevant part:

> (b) No person shall transfer a gaming license, a direct or indirect real interest, structure, real property, premises, facility, personal interest or pecuniary interest under a gaming license issued under this chapter or enter into an option contract, management contract or other agreement or contract providing for such transfer in the present or future, without the notification to, and approval by, the [C]ommission.
> . . .
> (c) The [C]ommission may include any reasonable additional requirements to the license conditions.

Mass. Gen. Laws ch. 23K, § 21(b), (c) (emphases added).

The district court found that the alleged San Diego Agreement constitutes an "unenforceable illegal contract" under Chapter 23K for two reasons. First, because the Commission "specific[ally] approv[ed]" a "price reduction to 'no more [than]

$35 million,'" and the alleged San Diego Agreement "effectively reinstat[es] the $75 million purchase price with respect to Gattineri without the Commission's approval." Gattineri, 2022 WL 123892, at \*11 (third alteration in the original). Second, because the "basis of the agreement [was] Gattineri's signing of the [C]ertificate, which was a requirement mandated by the Gaming Commission," and using the signing of the [C]ertificate as consideration for a contract, constitutes an "other agreement" for the "transfer" of a "personal or pecuniary interest under a gaming license," id., in direct violation of Chapter 23K since it was made "without[] notification to, and approval by, the [C]ommission" as required by the statute, id. (first alteration in original) (quoting Mass. Gen. Laws. ch. 23K, § 21(b), (c)).

Gattineri argues on appeal that the alleged contract is not illegal.[2] It does not violate Chapter 23K, he posits, because he is not bound by section 21(b) of the Gaming Act. In fact, he is "not bound by any requirement from the Commission," he contends,

---

[2] Gattineri also argues that the district court reached the conclusion that the alleged San Diego Agreement violated the statute based on disputed material facts. We reject this reasoning. The district court relied on the language of the Commission in approving the Ninth Amendment, the terms of the alleged San Diego Agreement, and the plain language of the statute -- none of which were in dispute -- in making its determination. Because the district court's conclusion was a pure question of law, the crux of the issue lies in whether the district court's interpretation of the Gaming Act was accurate, not on disputed facts.

because he is not a licensee, nor was he a party to the Ninth Amendment. Pointing to the "under a gaming license" language in the statute, he argues that he does not fall within the class of people the statute seeks to cover since he himself had no interest in obtaining a gaming license.

Wynn Defendants counter that the alleged contract not only violates Chapter 23K but also contravenes public policy. As to the statutory violation, they counter that Gattineri is covered by the statute because, although not a licensee, the plain language of sections 21(b) and (c) covers "person[s]" more generally since it dictates that "no person" shall enter into an "agreement" without the Commission's approval. Mass. Gen. Laws. ch. 23K, § 21(b). Gattineri, they argue, is certainly a "person" who engaged in an alleged agreement (the San Diego Agreement) that was not approved by the Commission. They further contend that even if that were not the case, whether Gattineri can be considered a licensee is irrelevant because the Commission imposed conditions on Wynn Defendants and these conditions should cover any transactions they engaged in, in relation to the license they sought, including a side deal with Gattineri. Additionally, they assert that the side deal violates public policy because it "thwart[s] the Legislature's express statutory purpose" -- "to ensure public confidence in the integrity of the licensing process" -- by going against the Commission's "broad authority to

condition the casino license on a reduced purchase price for the Parcel, and restrict the recipients of the sale proceeds." This type of agreement, Wynn Defendants argue, "is precisely the kind of conduct the Legislature sought to prevent in enacting the Gaming Act."

Thus, the questions before us are ones of statutory construction of state law and of Massachusetts public policy. In essence, the parties ask us to determine whether (1) the regulation of a side deal and the purchase price of a parcel of land between two private parties, in light of potential concealed, criminal ownership interests and/or environmental concerns, expressly violates Chapter 23K; or, whether, in the alternative, (2) this "underlying tendency of the contract . . . was manifestly injurious to the public interest and welfare," Beacon, 662 N.E.2d at 1017, as to be against public policy under the acts of the legislature or decisions of the Massachusetts courts.

While we would generally look to the text of the statute, intent of the legislature, and case law to address these issues, our de novo examination of the statutory scheme and the lack of precedent available to guide our analysis leads us to conclude that the best course to resolve these questions is to certify this issue. VanHaaren v. State Farm Mut. Auto. Ins. Co., 989 F.2d 1, 3 (1st Cir. 1993) ("Absent controlling state court precedent, a federal court sitting in diversity may certify a state law issue

- 43 -

to the state's highest court."); see e.g., Bos. Gas Co. v. Century Indem. Co., 529 F.3d 8, 15 (1st Cir. 2008) (certifying question because court "found no controlling SJC precedent on the . . . question and the issue is determinative of the scope of [the] claim)," certified question answered, 910 N.E.2d 290 (Mass. 2009).

Massachusetts SJC Rule 1:03 provides that the SJC "may answer questions of law certified to it" where the question "may be determinative of the cause then pending in the certifying court and . . . it appears to the certifying court [that] there is no controlling precedent in the decisions of [the SJC]." Mass. S.J.C. R. 1:03. That is certainly the case here. There is no question that the questions we certify are determinative of the issues before us, so we next address the text of the Gaming Act and lack of precedent.

1. The Gaming Act

Looking to the text of the Gaming Act, it is unclear how much authority the Massachusetts legislature sought to give the Commission. Enacted in 2011, the Gaming Act created a structured process for licensing and regulating casino and slots gambling in Massachusetts, thereby authorizing these activities for the first time in the Commonwealth. Mass. Gen. Laws. ch. 23K; see Abdow v. Att'y Gen., 11 N.E.3d 574, 577 (Mass. 2014) (summarizing text of the Gaming Act). In doing so, the Gaming Act created and

authorized the Massachusetts Gaming Commission -- comprised of five appointed Commissioners with expertise in criminal investigation and law enforcement, corporate finance and securities, and legal and policy issues -- to issue two types of licenses to operate gaming establishments. Mass. Gen. Laws. ch. 23K, § 3. It also established the IEB as the primary enforcement agent endowed with "such law enforcement powers as necessary to effectuate the purposes" of the Gaming Act. Id. § 6(a)-(b).

On the one hand, sections of the Gaming Act seem to grant the Commission extensive authority to administer gaming in the Commonwealth. For instance, section 21 -- which outlines the form of gaming and conditions for licensees -- appears to give the Commission wide latitude in restricting the issuance of licenses since subsection (c) allows the Commission to "include any reasonable additional requirements to the license conditions." Id. § 21(c) (emphasis added). This language suggests that, notwithstanding the conditions already listed, the Commission should be entitled to institute any other restrictions it deems necessary. Similarly, section 17 -- which explains how the Commission should process applications -- gives the Commission "full discretion as to whether to issue a license," id. § 17(g) (emphasis added), and "sharply curtail[s] the availability of judicial review of [C]ommission licensing decisions . . . thereby

vest[ing] a tremendous amount of discretion in the [C]ommission," City of Revere v. Mass. Gaming Comm'n, 71 N.E.3d 457, 471 (Mass. 2017). What is more, section 4, outlining the powers of the Commission, explicitly states that "[t]he [C]ommission shall have all powers necessary or convenient to carry out and effectuate its purposes including, but not limited to, the power to: . . . limit, condition, restrict, revoke or suspend a license, registration, finding of suitability or approval, or fine a person licensed, registered, found suitable or approved for any cause that the [C]ommission deems reasonable." Mass. Gen. Laws. ch. 23K, § 4(15) (emphasis added). Further, section 1, which lists Chapter 23's findings and declaration, ends by stating that "the power and authority granted to the [C]ommission shall be construed as broadly as necessary for the implementation, administration and enforcement" of the Gaming Act. Id. § 1(10) (emphasis added). These provisions, included in key sections of the Gaming Act, seem to serve as catchall provisions giving the Commission authority to place restrictions on side deals and the purchase price of land, and to place conditions on certain applicants (i.e., perhaps greater restrictions on those with potential criminal backgrounds).

On the other hand, the Gaming Act's policy objectives could be interpreted as placing limits on what otherwise might be considered broad authority, but the intent of the Commonwealth

legislature remains unclear. Section 1 provides that the "paramount policy objective" of the Gaming Act is to "ensur[e] public confidence in the integrity of the gaming licensing process and in the strict oversight of all gaming establishments through a rigorous regulatory scheme." Id. § 1(1) (emphasis added). In other words, even if we agree that the Commission does have extensive authority to regulate side deals (which we do not hold here), this authority is limited to that which ensures public confidence in licensing (or perhaps another policy objective we may find in the Act). Thus, our task is to determine whether the restrictions here ensure public confidence. But policy arguments do not "line up solely behind one solution," Bos. Gas Co., 529 F.3d at 14, and the parties do not point to any case law in either federal or state court interpreting section 21, the breadth of the authority of the Commission, or Massachusetts's public policy on these issues. The only case that does tangentially touch on these issues (discussed below) further complicates our inquiry but does not resolve it.

2. Lack of Precedent

Published after the district court issued its decision and Gattineri filed this appeal (but before oral argument), FBT Everett Realty, LLC v. Mass. Gaming Comm'n, 187 N.E.3d 373 (Mass. 2022), further muddles the district court's interpretation of section 21, rather than resolve the issues before us. There, the

SJC considered a suit by FBT against the Commission to recover the lost $40 million premium from the sale of the Parcel, alleging tortious interference with contract and a regulatory taking. Id. at 378. The SJC held that the state court properly dismissed the tortious inference claim but reversed the court's grant of summary judgment on the regulatory takings claim because the lower court failed to consider the "economic impact and the character of the government action," two of the three factors in the multifactor test for a regulatory taking. Id. at 382, 392. Ultimately, the SJC did not hold for either party and instead concluded that "summary judgment [could not] be granted on [the] record" as there were "material disputed facts on exactly what the [C]ommission expected or required Wynn [MA, LLC] to do, and what [it] did on its own initiative." Id. at 378.

While FBT does not resolve the issues before us, the SJC did raise noteworthy concerns regarding the conduct of the Commission, illustrating the importance of certifying our questions. For instance, in assessing the economic impact and character of the government action, the SJC noted that some of the Commission's actions were "highly unusual [in] character." Id. at 388. While not directly addressing the text of Chapter 23K, the court questioned the fact that the Commission (1) did not fully investigate "the possibility that someone with a criminal background" may have had an "undisclosed ownership interest in the

[P]arcel" or (2) consider other options in resolving this issue such as "refus[ing] to consider Wynn's bid altogether" or "reject[ing] Wynn's bid if it could not resolve the ownership issue to [the Commission's] satisfaction," before it approved a significantly reduced purchase price for the Parcel -- a "multimillion-dollar windfall at the expense of another private party." Id. at 386-87. While the SJC did note that the "[C]ommission ha[s] broad discretion in addressing its concerns about potential concealed, criminal ownership interests in FBT," it did not provide guidance as to the boundaries of that discretion, nor did it hold that the Commission had the power to "punish one party for its lack of candor," "ensure [that] such persons do not reap a financial windfall from the award of a gaming license," or "address the public perception that this was even a possibility." Id. at 387 (emphasis added).

Gattineri argues[3] that FBT should control our decision in this contract dispute. Nonetheless, FBT does not resolve this case since it was adjudicated at the summary judgment stage viewing the facts in the light most favorable to the non-moving party, FBT; did not ultimately resolve the dispute as a matter of law given the limited record; and contrary to Gattineri's assertion, made no holding as to the legality of side deals in connection

_____

[3] Gattineri made this argument at oral argument and in his reply brief, submitted after FBT was published.

with the statute and parties now in question. The cause of action in FBT is simply not the one before us. Even though FBT does not resolve our case, it does counsel in favor of certification. We simply cannot ignore that the SJC found "extraordinary" the "[c]onditioning [of] the grant of a governmental license [the gaming license at issue here] on the renegotiation of a transaction between private parties [Wynn Defendants and FBT] in this way, so as to effectively transfer $40 million dollars from one [party, here FBT] to another [Wynn Defendants]." Id.

3. Questions Certified

We must underscore that the issues before us involve important questions of state law and public policy with significant implications, not only for the parties before us, but also for other industries in the state, such as online gambling and horse racing, among others. "Given the social evils associated with gambling and the state's revenue interests, the state's choice of means in the selection of licensees is entitled to prevail," Medina v. Rudman, 545 F.2d 244, 251 (1st Cir. 1976), and so too the highest court's (the SJC) careful balancing of the legislature's statutory scheme.

This case then meets the requirements set forth in SJC Rule 1:03. Mass. S.J.C. R 1.03. We recognize that our answering the important policy questions raised in this appeal "may offend the comity due to local courts, since [Massachusetts] courts have

never addressed this specific issue." Santiago-Hodge v. Parke Davis & Co., 859 F.2d 1026, 1033 (1st Cir. 1988). Thus, the questions specified below will be referred to the Massachusetts SJC for its consideration. We have addressed all other issues, confirming that the certified issues do affect the ultimate outcome. The questions are as follows:

> 1) Is the San Diego Agreement unenforceable because it violates Section 21 of the Gaming Act?
> 2) If not, is the San Diego Agreement unenforceable for reasons of public policy of ensuring public confidence in the integrity of the gaming licensing process and in the strict oversight of all gaming establishments through a rigorous regulatory scheme?

We also welcome any additional observations about relevant Massachusetts law that the SJC may wish to provide.

The clerk of this court is directed to forward to the SJC, under the official seal of this court, a copy of the certified questions and our decision in this case, along with a copy of the briefs and appendices filed by the parties in this case. We retain jurisdiction over this appeal and will frame our ultimate decision and judgment after receiving such guidance on the certified questions as the SJC may be prepared to give. No costs will be taxed at this stage of the proceedings, but the issue may be revisited after we receive the answer to the certified questions.

It is so ordered.