NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13416

ANTHONY GATTINERI  vs.  WYNN MA, LLC, & another.[1]


Suffolk.      September 13, 2023. - November 3, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Gaming.  License.  Contract, Option, Performance and breach.
    Real Property, Option.  Public Policy.  Statute,
    Construction.  Constitutional Law, Taking of property.
    Supreme Judicial Court, Certification of questions of law.


Certification of questions of law to the Supreme Judicial
Court by the United States Court of Appeals for the First
Circuit.


    Kelley A. Jordan-Price (Michael J. Connolly & John A.
LeBlanc also present) for the plaintiff.
    Emily Kanstroom Musgrave (Samuel M. Starr & Catherine S.
Lombardo also present) for the defendants.
    Howard M. Cooper, Ian J. Pinta, & Christian G. Kiely, for
FBT Everett Realty, LLC, amicus curiae, submitted a brief.
    David S. Mackey, Melissa C. Allison, & Sean M. Grammel,
Special Assistant Attorneys General, for Massachusetts Gaming
Commission, amicus curiae, submitted a brief.

---

[1] Wynn Resorts, Limited.

KAFKER, J.  As part of their bid to win a casino license in Massachusetts, defendants Wynn MA, LLC, and Wynn Resorts, Limited (collectively, Wynn),[2] entered into an option contract with FBT Everett Realty, LLC (FBT), to purchase a parcel of land in Everett and Boston (FBT parcel) for $75 million.  As Wynn's casino license application proceeded, the Massachusetts Gaming Commission (commission) discovered the possibility of concealed ownership interests in FBT by a convicted felon with connections to organized crime.  Extensive investigation by the commission of FBT, however, did not resolve those concerns.  In response to the commission's lingering concerns, and after further negotiations, FBT and Wynn amended their option agreement and lowered the purchase price for the FBT parcel to $35 million, a figure that reflected the fair market value of the parcel if it were not used as a casino.  The amended option agreement was submitted to the commission, and as a condition of its approval of the amendment, the commission imposed a price cap of $35 million on the sale of the FBT parcel.  The commission also required that the three publicly known members of FBT certify that they would be the "exclusive recipients" of the FBT parcel sale proceeds.

---

[2] Defendant Wynn MA, LLC, is a wholly owned subsidiary of codefendant Wynn Resorts, Limited.

Plaintiff Anthony Gattineri, a minority owner of FBT, opposed the price reduction and refused to sign the certificate as required by the commission, arguing that he deserved to be paid his percentage of the price reduction. Gattineri alleges that at a meeting with Wynn vice-president Robert DeSalvio in San Diego, California, the two men agreed that in exchange for Gattineri signing the certificate, Wynn would "make Anthony Gattineri whole" by paying him an additional nearly $19 million, calculated as Gattineri's proportional share of the $40 million price reduction on the FBT parcel. This agreement was neither committed to writing nor communicated to the commission. Gattineri was also a person of particular interest to the commission, as he not only was one of the three principals of FBT but had also bought out the convicted felon's ownership interest in FBT and still owed him money at the time of the investigation.

Gattineri eventually signed the certificate. The commission then later awarded Wynn a casino license. However, Wynn never paid Gattineri the additional $19 million he alleges he was owed, so he sued Wynn in the United States District Court for the District of Massachusetts. Gattineri argues that Wynn has committed a breach of the contract (San Diego agreement) formed between Gattineri and Wynn that induced Gattineri to sign the certificate.

A Federal District Court judge granted summary judgment for the defendants on all counts, and Gattineri appealed to the United States Court of Appeals for the First Circuit. The First Circuit, reasoning that the enforceability of the San Diego agreement under Massachusetts law was potentially dispositive of the case, certified the following questions to this court:

> 1. "Is the San Diego Agreement unenforceable because it violates [§] 21 of the Gaming Act?"[3]
>
> 2. "If not, is the San Diego Agreement unenforceable for reasons of public policy of ensuring public confidence in the integrity of the gaming licensing process and in the strict oversight of all gaming establishments through a rigorous regulatory scheme?"

Gattineri v. Wynn MA, LLC, 63 F.4th 71, 95 (1st Cir. 2023). See S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981) (requirements for certification).

We conclude that the San Diego agreement is unenforceable for reasons of public policy. By its express terms, the paramount public policy of the Expanded Gaming Act (gaming act), G. L. c. 23K, is to protect the integrity and public confidence in the casino gambling licensure process. This public policy, reflecting both the risks presented by large-scale gambling operations and the recognized need for their strict regulation, has been consistently emphasized in our gambling statutes and our case law. Consequently, an agreement, concealed from the

---

[3] G. L. c. 23K, § 21, inserted by St. 2011, c. 194, § 16.

commission empowered to review and approve casino licenses and inconsistent with the terms presented to, and approved by, the commission to address its concerns about the possibility of involvement of organized crime, is therefore unenforceable as a violation of public policy.  Because we hold that the San Diego agreement is unenforceable for reasons of public policy, we need not reach the question whether it is separately unenforceable under § 21 of the gaming act.[4]

1.  Background.  a.  Facts.  We recite the facts as stated by the certifying court, supplemented by undisputed facts in the parties' appendices.  Because this case was decided on a motion for summary judgment, we recite the facts "in the light most favorable to the nonmoving party," here Gattineri. See Dorchester Mut. Ins. Co. v. Miville, 491 Mass. 489, 492 (2023), quoting Dorchester Mut. Ins. Co. v. Krusell, 485 Mass. 431, 435 (2020).

Gattineri is a 46.69 percent minority nonmanaging member of FBT.  The other principals of FBT are Paul Lohnes and Dustin DeNunzio.  In 2009, FBT purchased the FBT parcel, located in Everett and Boston, where the Encore Boston Harbor resort and casino now stands.  In December 2012, Wynn entered into an option agreement with FBT to purchase the parcel for $75

---

[4] We acknowledge the amicus briefs submitted by the Massachusetts Gaming Commission and by FBT Everett Realty, LLC.

million. The option agreement required FBT to remediate some of the environmental contamination on the parcel. FBT also agreed that it and its members would "reasonably cooperate with [Wynn] with respect to any information it reasonably requires to complete the Casino Application and respond to any such inquiries throughout the licensing process." In January 2013, Wynn filed an application with the commission for a Region A Category 1 gaming license to operate a resort and casino in Massachusetts. As a part of the application process, the commission's investigations and enforcement bureau (IEB) began investigating Wynn and FBT to determine Wynn's suitability for a gaming license.

During the investigation, the IEB became concerned by the possibility that Charles Lightbody, a convicted felon with ties to organized crime, had hidden ownership interests in FBT. The basis for these suspicions were telephone calls recorded in December of 2012 between Lightbody and an inmate in State prison wherein Lightbody referenced ownership or control of the FBT parcel and the need to conceal it from the commission. Gattineri stated that he obtained Lightbody's 12.05 percent membership interest in FBT via a memorandum of transfer and promissory note for $1.7 million. FBT manager Dustin DeNunzio admitted to the IEB that he had altered the memorandum of transfer and promissory note to create the impression that

Lightbody divested his interest in FBT in August 2012, prior to the December 2012 option agreement with Wynn. Those documents, however, were actually executed in July 2013, heightening the IEB's concerns.

The IEB concluded that Lightbody had held an ownership interest in FBT for longer than had been disclosed by FBT, and thus the IEB was concerned that he continued to be involved without the commission's knowledge. There was also evidence that Gattineri had not fully paid the promissory note and satisfied the terms of the memorandum of transfer, raising questions about whether Lightbody retained some reversionary interest.[5] When the IEB investigation was near completion, IEB director Karen Wells informed Wynn of the IEB's findings and concerns regarding the FBT parcel sale. Wells told Wynn that how it proceeded regarding FBT "receiving a financial windfall as a result of the gaming facility was something the IEB would report on regarding [Wynn's] suitability [to hold a casino license]."

---

[5] In a July 2013 interview with police, Gattineri stated that he owed Lightbody "like, a million," and when asked whether Lightbody still had an ownership interest in a portion of FBT, he replied, "Well, if I don't pay him, he can take it away from me." In June of 2014, before Gattineri signed the certificate as required by the commission, he paid the money owed to Lightbody and owned Lightbody's share of FBT outright.

In response to the concerns expressed by the IEB, Wynn hired an appraiser to study the FBT parcel and determined that the fair market value for the FBT parcel if it were not used for a casino was approximately $35 million. As the IEB investigation was ongoing, Wynn and FBT were negotiating environmental liabilities associated with the FBT parcel. Following these negotiations, Wynn and FBT agreed to the ninth amendment to the option agreement (ninth amendment), whereby the purchase price for the FBT parcel would be reduced to $35 million and FBT's environmental liabilities would be capped at $10 million. Gattineri opposed the purchase price reduction, but as minority owner of FBT, he was unable to stop the ninth amendment's ratification.

Wynn submitted the ninth amendment to the commission for its review and approval, describing the agreement as the "proposed resolution to concerns raised by the [IEB] . . . about undisclosed interests in FBT." In testimony before the commission, Wynn general counsel Kim Sinatra stated that Wynn had fashioned the ninth amendment as a response to "the seriousness of the concerns expressed" by the IEB. Wynn represented that $35 million was the fair market value of the FBT parcel assuming it would not be used for a casino, thus obviating any concern about undisclosed interests in FBT obtaining a casino premium from the sale of the FBT parcel.

Sinatra told the commission that the price reduction had been negotiated "to take away from the transaction . . . the enhanced benefit, economic benefit[,] that casino usage would add to [the] valuation of this property."

The commission credited Wynn's dedication to addressing the concerns about FBT brought to them by the IEB, characterizing the ninth amendment as a "prompt and aggressive" attempt to remedy IEB's concerns. It further noted that the ninth amendment was "a thought[ful], careful exhaustive, appraisal of . . . what a fair market value would be for a noncasino use" of the FBT parcel. A commissioner also expressed his belief that "none of the appreciation of [the FBT parcel] that came from the sale" should "go[] to somebody who's been dishonest" with the IEB or the commission.

The commission then approved Wynn's purchase of the FBT parcel after imposing two conditions on the parties. First, it required that Wynn pay no more than $35 million in exchange for the FBT parcel, reflecting the value of the parcel without a casino premium. Second, the three members of FBT (Gattineri, Lohnes, and DeNunzio) would be required to sign under oath certificates stating that they would be the "exclusive recipients of the proceeds" of the FBT parcel sale. The commission also directed the IEB to deliver its files to the

United States Attorney, the Attorney General of Massachusetts, and the district attorney for the Suffolk district.

Lohnes and DeNunzio signed the certificates on December 23, 2013, but Gattineri refused to do so. For several months, Gattineri met with various Wynn representatives but refused to sign the certificate, protesting that he would not sign unless he was given his share of the $40 million price reduction.

On June 14, 2014, Gattineri met with Wynn vice-president Robert DeSalvio at the Westgate Hotel in San Diego. Gattineri alleges that at this meeting, he and DeSalvio agreed that if Gattineri signed the certificate and Wynn subsequently obtained a gaming license, Wynn would "make Anthony Gattineri whole." According to Gattineri, "making [him] whole" meant paying him around $19 million, calculated as his 46.69 percent share of the $40 million price reduction on the FBT parcel. A few hours after his June 14 meeting with DeSalvio, Gattineri signed a certificate stating that he would be the sole recipient of his share of the FBT parcel purchase price. Neither Wynn nor Gattineri alerted the commission to the San Diego agreement.[6]

_____

[6] Gattineri argues that the public, and thus the commission, was on notice as to the existence of the San Diego agreement. In support of this contention, Gattineri points to a July 13, 2014, Boston Globe article. The article's sixteenth paragraph mentions that Gattineri signed the certificate to "preserv[e] the possibility that he would be paid more than $16 million if Wynn gets his casino." The parties disagree as to whether this is a reference to Gattineri's share of the $35 million purchase

Gattineri stated in a deposition that he asked DeSalvio to put the San Diego agreement in writing and that DeSalvio refused to do so "because of the gaming law."[7]

On June 18, 2014, Wynn sent the commission a copy of the certificate. In September 2014, Wynn was granted a gaming license by the commission and subsequently bought the FBT parcel for $35 million. Wynn did not pay Gattineri the $19 million that he alleges he was due under the San Diego agreement.

In October 2014, Gattineri was indicted in the Federal District Court for alleged fraud in connection with FBT's ownership of the FBT parcel and was arraigned in the Superior Court on charges of impeding a gaming investigation, conspiracy, and tampering with evidence. In 2016, Gattineri was acquitted

---

price (which amounted to slightly over $16 million) or a very oblique reference to the San Diego agreement (valued at roughly $19 million). In either case, we disagree with Gattineri's contention that one oblique line in a newspaper article reasonably could support a rationale for finding that the San Diego agreement is a public agreement.

[7] Because we interpret the facts in the light most favorable to Gattineri, we assume for the purposes of this opinion that the San Diego agreement took place in the manner Gattineri alleges. We do not determine that Wynn and Gattineri actually entered into the San Diego agreement, although we note that the commission has the right and even the responsibility to determine whether such an agreement was made, and the alleged conduct may be subject to further investigation.

of all Federal charges, and the Commonwealth thereafter entered nolle prosequis with respect to the State charges.[8]

b. Procedural history. In June 2018, Gattineri sued Wynn in the United States District Court for the District of Massachusetts, alleging breach of contract, common-law fraud, and unfair or deceptive trade practices in violation of G. L. c. 93A, § 11. Arguing that Wynn had "fail[ed] to make him whole," Gattineri sought almost $19 million in damages. A Federal District Court judge granted Wynn's motion for summary judgment on all three counts, and Gattineri appealed. On appeal, the First Circuit determined that the ultimate legality of the San Diego agreement was potentially dispositive of Gattineri's suit. Gattineri, 63 F.4th at 90. Reasoning that the legality of the San Diego agreement involves "important questions of state law and public policy with significant implications," the First Circuit certified questions for our review. Id. at 94.

2. Discussion. a. Public policy and the gaming act. "The general rule of our law is freedom of contract . . . ." Beacon Hill Civic Ass'n v. Ristorante Toscano, Inc., 422 Mass. 318, 320 (1996), quoting Smith v. The Ferncliff, 306 U.S. 444,

---

[8] Lightbody was also acquitted of the charges related to the sale of the FBT parcel. United States v. DeNunzio, 450 F. Supp. 3d 86, 88 (D. Mass. 2020).

450 (1939). However, "it is 'universally accepted' that public policy sometimes outweighs the interest in freedom of contract, and in such cases the contract will not be enforced." Feeney v. Dell Inc., 454 Mass. 192, 199-200 (2009), citing Beacon Hill Civic Ass'n, supra at 321. "The grounds for a public policy exception must be clear in the acts of the Legislature or the decisions of this court." Trustees of the Cambridge Point Condominium Trust v. Cambridge Point, LLC, 478 Mass. 697, 705 (2018), quoting Miller v. Cotter, 448 Mass. 671, 683 (2007). "'Public policy' in this context refers to a court's conviction, grounded in legislation and precedent, that denying enforcement of a contractual term is necessary to protect some aspect of the public welfare." Rawan v. Continental Cas. Co., 483 Mass. 654, 666 (2019), quoting Beacon Hill Civic Ass'n, supra. With these principles in mind, we consider whether the San Diego agreement is unenforceable on public policy grounds.

This court has long recognized that the legalization and regulation of gambling are among the Legislature's core police powers, given the risks associated with gambling operations. Abdow v. Attorney Gen., 468 Mass. 478, 489-490 (2014). See Selectmen of Topsfield v. State Racing Comm'n, 324 Mass. 309, 315-316 (1949) (Legislature has authority to impose conditions on gambling that it "deem[s] necessary in the public interest"). See also Commonwealth v. Wolbarst, 319 Mass. 291, 294 (1946)

(explaining that "suppression of gambling lies within the domain of the police power of the Commonwealth").  "[B]ecause of the nature of the business[, gambling] can be abolished at any time that the Legislature may deem proper for the safeguarding and protection of the public welfare."  Carney v. Attorney Gen., 451 Mass. 803, 817 (2008), quoting Selectmen of Topsfield, supra at 315.  Where gambling has been legalized, the Legislature has strictly regulated it, giving administrative agencies broad powers to oversee its licensing and operation to protect the public interest.  See G. L. c. 23K, § 1 (10) (providing that "the power and authority granted to the commission shall be construed as broadly as necessary" to implement and administer gaming act).  See also Colella v. State Racing Comm'n, 360 Mass. 152, 159 (1971) (recognizing that because "inherent in any [large] gambling operation" are "many perils, pitfalls, temptations and traps for the unwary" as well as "occasions for corruption for the participants," Legislature gave "very broad powers" to State Racing Commission to address these "dangers").  We have also already recognized these specific concerns and powers in this exact context in Revere v. Massachusetts Gaming Comm'n, 476 Mass. 591, 597-598 (2017) (explaining broad discretion afforded to commission and importance placed on public confidence in integrity of gaming licensing process under gaming act).

The text of the gaming act reflects this commitment to strict regulation to promote the integrity, and reduce the risks, of casino gambling. As the Legislature expressly stated: "ensuring public confidence in the <u>integrity of the gaming licensing process</u> and in the strict oversight of all gaming establishments through a rigorous regulatory scheme is the paramount policy objective of [the gaming act]" (emphasis added). G. L. c. 23K, § 1 (1). Thus, "the power and authority granted to the commission shall be construed as broadly as necessary for the implementation, administration and enforcement of [the gaming act]." G. L. c. 23K, § 1 (10). The gaming act pursues this objective by, inter alia, requiring comprehensive investigation and regulation of gaming industry participants, ranging from commission members and employees to casino license applicants, licensees, and their business associates. See G. L. c. 23K, §§ 1 (1), 3 (<u>a</u>), (<u>l</u>), 6 (<u>b</u>), 12 (<u>a</u>).[9]

---

[9] The focus on integrity and public confidence begins with the selection of the commissioners themselves. "Prior to appointment to the commission, a background investigation shall be conducted into the financial stability, integrity, and responsibility of a candidate, including [his or her] reputation for good character, honesty and integrity." G. L. c. 23K, § 3 (<u>a</u>). See also G. L. c. 23K, § 3 (<u>l</u>) (requiring background checks for all commission employees and stating that employees are generally disqualified by past convictions of felonies or crimes involving dishonesty). Although commission members and employees are subject to the general code of conduct for public employees, the commission is required to "establish a code of ethics . . . more restrictive than" that imposed on other government employees. G. L. c. 23K, § 3 (<u>m</u>). The commission's

The commission is directed to "assure . . . that there shall be no material involvement directly or indirectly with . . . a gaming operation or the ownership thereof, by unqualified, disqualified or unsuitable persons or by persons whose operations are conducted in a manner not conforming with" the gaming act.  G. L. c. 23K, § 4 (9).  Importantly, the commission may "require a person who has a business association of any kind with a gaming licensee or applicant to be qualified for licensure under [the gaming act]."  G. L. c. 23K, § 4(11).  Because Gattineri, as one of the owners of the FBT parcel, was "a person who ha[d] a business association . . . with a gaming licensee or applicant" (that is, Wynn), the commission had, at a minimum, the power to review Gattineri's involvement in the parcel as part of Wynn's qualifications for licensure.  Id.  As explained in more detail infra, Gattineri was also "a business association" of particular concern.  He had purchased the interest in FBT of a convicted felon with possible connections to organized crime, and there were multiple unanswered questions related to that purchase.  The gaming act also provides for an in-depth investigation of the qualifications and suitability of

_____

code of ethics prohibits "the receipt of gifts by commissioners and employees from any gaming licensee, applicant," or his or her business associates, and "provid[es] for recusal of a commissioner . . . due to a potential conflict of interest." Id.

licensees and their associates to ensure their integrity. The gaming act created the IEB, designated as a "law enforcement agency" and empowered it with "such law enforcement powers as necessary to effectuate the purposes" of the gaming act. G. L. c. 23K, § 6 (b). Once the commission has received an application for a gaming license, the IEB is authorized to investigate "without limitation . . . the integrity, honesty, good character and reputation of the applicant" (emphasis added). G. L. c. 23K, § 12 (a) (1). Applicants seeking gaming vendor licensure can be required to produce records including

> "a criminal and arrest record; . . . any civil judgments obtained against the person pertaining to antitrust or security regulation; . . . an independent audit report of all financial activities and interests including, but not limited to, the disclosure of all contributions, donations, loans, or any other financial transaction to or from a gaming entity or operator in the past [five] years; and . . . clear and convincing evidence of financial stability . . . . The commission may require such other information as it considers appropriate including, but not limited to, information related to the financial integrity of the applicant . . . ."

G. L. c. 23K, § 31 (b). The commission may further require, "at its sole discretion, . . . [investigation of] other persons or companies that have a business association of any kind with the applicant." 205 Code Mass. Regs. § 116.02(2) (2012).

The affirmative obligations of those whose qualification and suitability are being evaluated are also set out in the gaming act. Such persons "have the continuing duty to provide

any assistance or information required by the commission and to cooperate in any inquiry or investigation conducted by the commission." G. L. c. 23K, § 13 (b). They may not "willfully withhold information from, or knowingly give false or misleading information to, the commission." G. L. c. 23K, § 13 (c). Lack of transparency by an applicant, licensee, or other person required to be qualified for licensure can result in the denial of an application or the revocation of a license already granted. Id.

All these requirements are designed to develop a thorough understanding of the applicants and their associates to ensure the integrity of the gambling license and operation. The concealing of information relevant to this inquiry is strictly prohibited.

Given the well-defined public policy concerns set out in the gaming act and the case law, we turn to the licensing process and the specific contracts at issue.

b. Core regulatory concern requiring full investigation and disclosure of the details of the FBT parcel sale. In the instant case, the commission was confronted with very troubling evidence indicating that Lightbody, a convicted felon with possible connections to organized crime, might have an undisclosed ownership interest in the parcel of land that would be a part of a casino license application. That interest had

also been purchased by Gattineri pursuant to a promissory note and memorandum of understanding. The details of that purchase were also suspicious, as documents had been backdated. All of this made the details of the FBT parcel sale to Wynn, including Gattineri's interest in it, a matter of significant regulatory concern, requiring full investigation and disclosure.

Gattineri's interest in the property and the price he would receive for it were therefore well within the regulatory powers of the commission. The commission's follow-up investigation also made its lingering concerns regarding Lightbody and Gattineri clear to all of those involved. As a result, any additional contract involving Gattineri's compensation should have been presented to the commission by Wynn or Gattineri himself. Wynn and Gattineri's statutory obligations to fully disclose pertinent information and to not mislead the commission required such presentation particularly because of the concerns that Lightbody might still be involved, and because Gattineri was the one who transacted with him. See G. L. c. 23K, § 13 (b), (c). Consequently, the enforcement of any contracts concealed from the commission and compensating Gattineri for his interest in the property would be a violation of public policy.

c. A secret contract with terms inconsistent with those disclosed to the public. Not only was the alleged San Diego agreement concealed from the commission, but it was also

inconsistent with the publicly disclosed terms and conditions upon which the sale of the FBT property had been approved.  This provides an additional reason for rendering the San Diego agreement unenforceable.

The commission had approved the sale of the FBT parcel to Wynn with two specific conditions designed to address its concerns about undisclosed interests with connections to organized crime.  First, it sought certificates from FBT members that confirmed their ownership stake in FBT and that they would be the only recipients of the FBT parcel sale proceeds.  Second, it required that "the sale price" of the FBT parcel be "no more [than] $35 million" to ensure that the purchase of the parcel would not reflect a casino premium.  The commission considered the price reduction necessary to promote public confidence in the integrity of the deal, as the combination of the IEB's investigation, the certificates, the capped price, and the turning over of files to the United States Attorney, the Attorney General of Massachusetts, and the district attorney for the Suffolk district for further investigation demonstrated the commission's commitment to preventing any persons with connections to organized crime from profiting from the awarding of the license.

In response, Gattineri refused to sign the certificate. Instead, he would only do so if he received extra compensation.

That compensation, he claims, was to be provided in the San Diego agreement, a contract for an additional $19 million that was concealed from the commission.

Secret deals in violation of the public terms and conditions required for gaming licensure are unenforceable violations of public policy. They place in grave doubt the integrity of the public process for awarding the license, and thereby defeat the public's confidence in that process. See G. L. c. 23K § 1 (1); Abdow, 468 Mass. at 489-490; Colella, 360 Mass. at 158. As a result, they are unenforceable.

As alleged by Gattineri, he and Wynn's representative negotiated a secret oral agreement for additional compensation beyond the $35 million cap required as a condition for approval of the license. It was also to be paid to Gattineri, the person who had purchased an additional interest in FBT from Lightbody, the convicted felon with ties to organized crime who was recorded claiming to still have an interest in the FBT parcel, thereby raising concerns that such additional undisclosed compensation might end up in his hands. It is hard to imagine contractual conditions more likely to undermine the public's confidence in the licensing process. According to Gattineri, the deal was negotiated in private, done orally and not in writing, and deliberately concealed from the commission. Enforcement of such a secret agreement, contradicting the public

terms of approval, constitutes a clear violation of public policy.

d. The unusual nature of the price condition, the commission's authority, and the legality of the response to the condition. Finally, we address the regulatory taking issue left open by our discussion of the ninth amendment in FBT Everett Realty, LLC v. Massachusetts Gaming Comm'n, 489 Mass. 702 (2022).

Referencing that decision, Gattineri argues that the San Diego agreement does not violate public policy because the commission exceeded its authority in requiring a reduction in the purchase price of the FBT parcel. See id. at 716. In that case, we reversed the entry of summary judgment in favor of the commission on FBT's regulatory taking claim, on the grounds that the motion judge did not apply the correct legal standard for regulatory takings and that the $35 million cap constituted a "highly unusual" regulatory decision even though the commission had "broad discretion in addressing its concerns about potential concealed, criminal ownership interests in FBT." Id. at 714, 715. In particular, we questioned whether the cap may have compelled the transfer of the value of the property from one group of private parties, the FBT principals, to another, Wynn. Id. at 717. We emphasized in that case, as we do here, however,

that these facts remain disputed and were not resolved by this court in FBT Everett Realty, LLC.  See id.

But even if we were to assume that the commission somehow exceeded its authority and effectuated a taking against FBT by limiting the FBT parcel purchase price to $35 million, the proper course of action would have been to seek compensation from the commission, as FBT has done in the lawsuit it brought against the commission.  See id. at 707-708 (discussing FBT's lawsuit).  The solution to administrative overreach is a public process challenging such overreach, not secret deals.  As a result of FBT's lawsuit, the public will be apprised of the commission's actions and whether those actions constituted an unlawful taking.  See id. at 717.  By contrast, Gattineri attempted to evade the commission's publicly declared requirements for a gaming license by enacting a secret side deal inconsistent with those requirements.  Such a secret side deal is an unenforceable contract in violation of public policy regardless of whether the commission itself exceeded its authority in conditioning the license on a $35 million cap.

3.  Conclusion.  We answer the second certified question as follows.  An agreement, concealed from the commission empowered to review and approve casino licenses, and inconsistent with the terms presented to, and approved by, the commission to address its concerns about the possible involvement of organized crime,

is unenforceable as a violation of public policy.  Because we hold that the San Diego agreement is unenforceable for public policy reasons, we need not and do not answer the first question, regarding whether it also violates § 21 of the gaming act.

The Reporter of Decisions is directed to furnish attested copies of this opinion to the clerk of this court.  The clerk in turn will transmit one copy, under the seal of the court, to the clerk of the United States Court of Appeals for the First Circuit, as the answer to the question certified, and will also transmit a copy to each party.