PARK DRIVE TOWING, INC. *vs.* CITY OF REVERE & others.[1]

Suffolk. May 4, 2004. - June 11, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Municipal Corporations,* Contracts. *Contract,* Municipality, Validity. *Statute,* Construction. *Consumer Protection Act,* Unfair act or practice, Trade or commerce.

A Superior Court judge properly granted summary judgment to the defendants in a civil action alleging breach of the implied covenants of good faith and fair dealing by the defendant city in suspending the plaintiff towing company, with no notice or procedure for opposition, from the city's list of such businesses that are authorized to perform police-ordered tows, and then in refusing reinstatement after criminal charges against the plaintiff's owners had been resolved in their favor, where no enforceable contract existed in that the requirements of G. L. c. 43, § 29, which controls municipal contracts, were not met [83-85]; moreover, the plaintiff's argument that situations involving the payment of fees or monies to municipalities fell outside the statute's ambit was unavailing [85], and the plaintiff's claim of unfair or deceptive acts or practices in violation of G. L. c. 93A, § 11, failed in light of this court's conclusion that no contract existed between the parties, particularly where the municipal defendant was not engaging in trade or commerce [85-86].

CIVIL ACTION commenced in the Superior Court Department on November 27, 1998.

A motion for partial summary judgment was heard by *Vieri Volterra,* J., and the case was heard by *Robert H. Bohn, Jr.,* J., on a motion for summary judgment.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Bruce T. Macdonald* for the plaintiff.

*Ira H. Zaleznik* for city of Revere & another.

*Austin M. Joyce,* for Roy Colannino, submitted a brief.

---

[1]James Russo and the chief of police of Revere. The complaint named James Russo individually and in his capacity as the chief of police of Revere. In the plaintiff's first amended complaint, Russo's successor, Roy Colannino, was named a defendant in his capacity as chief of police.

*William T. Hogan, III, & Elizabeth D. Killeen,* for Statewide Towing Association, Inc., amicus curiae, submitted a brief.

COWIN, J. Park Drive Towing, Inc. (Park Drive), a Massachusetts corporation that provided vehicle towing services for law enforcement agencies and the general public, sued the city of Revere (city) and the former chief of police and his successor for breach of contract and unfair or deceptive acts or practices in violation of G. L. c. 93A, § 11. The defendants' motions for summary judgment were granted by the Superior Court,[2] and the Appeals Court affirmed. See *Park Drive Towing, Inc. v. Revere,* 60 Mass. App. Ct. 173, 178 (2003). We granted the plaintiff's application for further appellate review and now affirm the judgments of the Superior Court.

The essential facts are not in dispute. At all times relevant to this appeal, the city maintained a "tow list." This list consisted of three towing companies authorized to perform police-ordered tows of vehicles, for example, towing vehicles that were obstructing snow removal. In return for collecting fees from the towed vehicles' owners, the towing companies were required to collect from the owner and remit to the city a $15 "administrative fee" for each car towed, provide certain services to city vehicles free of charge (such as jump starts and changing flat tires) and comply with other conditions.[3] The record does not include evidence of any procedure by which a towing company is placed on the list, nor does it include any written rules governing the "tow list" or any written agreement between the city and any towing company on the list.

---

[2]The defendants filed two motions for summary judgment that were allowed by two different Superior Court judges. Summary judgment was first allowed as to the successor chief of police and later as to the city and the former chief of police.

[3]According to the deposition of Sergeant James Griffin, who oversaw "the everyday operations . . . as far as police tows," these requirements, which he could only "guess [were] mandated by the Chief," were that each towing company have sufficient room to store towed cars and that they charge special rates for cars towed on account of snow removal or street sweeping. According to John Lentz, III, coowner and president of Park Drive since September 26, 1996, the requirements also included that the owners of the tow companies have no criminal record relating to insurance fraud or the "auto industry," that tow truck drivers be licensed and subject to "record checks," that the companies maintain adequate equipment and sufficient insurance, that they remain open twenty-four hours per day, and that they keep a proper log of all tows.

At some point before September, 1996, Park Drive's owner, Arthur Norris, arranged with Chief of Police James Russo to have Park Drive placed on the "tow list." On September 26, 1996, Norris sold Park Drive to two brothers, John and Michael Lentz, and Dante Spadoni. Prior to the sale, Norris represented to the buyers that Park Drive would remain on the tow list after the transfer of ownership. The contract for the sale of Park Drive refers to "a contract with the City of Revere to tow for the City" and provides that city approval would be secured for the new owners either to receive an assignment of that contract or enter into a new contract with the city. However, there is no evidence in the record that a written contract memorializing the arrangement between Park Drive and the city ever existed, nor is there evidence in writing that any city official approved or acknowledged the terms of the contract for the sale of Park Drive. Prior to the sale, the Lentz brothers and Spadoni twice met with Chief Russo to "review all documentation of the sale" and the city rules pertaining to towing.

Between September 26, 1996, and October 20, 1998, Park Drive derived approximately $150,000 per year from tows ordered by the city's police department. To retrieve their towed vehicles, owners paid directly to Park Drive a $75 tow charge, a $20 per day storage fee, and the $15 city administrative fee. Park Drive retained these monies except for the administrative fee, which it remitted to the city.

On October 20, 1998, Park Drive was orally notified of Chief Russo's decision to suspend Park Drive from the tow list because criminal complaints had been issued against the Lentz brothers.[4] In early February, 1999, the charges against Michael Lentz were dismissed, and John Lentz was found not guilty after a jury trial. Meanwhile, without the revenues from police-ordered tows, Park Drive defaulted on its purchase money note to Norris, who repossessed Park Drive's tow trucks, and Park Drive filed for bankruptcy. Chief Russo refused to reinstate

---

[4]The criminal complaints, alleging that the Lentz brothers had engaged in insurance fraud and larceny, were apparently initiated by Spadoni, who by this time no longer was involved with Park Drive.

Park Drive to the tow list.[5] Chief Russo retired on March 1, 1999, and his successor likewise refused to reinstate Park Drive.

Park Drive argues that the defendants' breach of contract occurred when the city summarily suspended Park Drive from its tow list with no notice and without "any procedure in place where a towing company would be entitled to a hearing to present [its] side of the story," and then refused reinstatement after the criminal charges against the Lentz brothers had been resolved in their favor. These actions, Park Drive asserts, breached the implied covenants of good faith and fair dealing. The defendants rely primarily on G. L. c. 43, § 29, which sets forth requirements for municipal contracts.[6] That statute provides in pertinent part that "[a]ll contracts made by any department, board or commission where the amount involved is five thousand dollars or more shall be in writing, and no such contract shall be deemed to have been made or executed until the approval of the mayor . . . and also of the officer or the head of the department or of the chairman of the board . . . making the contract is affixed thereto." G. L. c. 43, § 29. The defendants contend, and we agree, that because these requirements were not met, no enforceable contract existed.

It is a well-established principle that a party "dealing with a city or town cannot recover if statutory requirements [such as those contained in G. L. c. 43, § 29,] have not been observed." *Richard D. Kimball Co.* v. *Medford*, 340 Mass. 727, 729 (1960). See *United States Leasing Corp.* v. *Chicopee*, 402 Mass. 228, 231 (1988); *Quincy* v. *Brooks-Skinner, Inc.*, 325 Mass. 406, 412-413 (1950); *McGovern* v. *Boston*, 229 Mass. 394, 397 (1918); *Lumarose Equip. Corp.* v. *Springfield*, 15 Mass. App. Ct. 517, 519-520 (1983).[7] In *Central Tow Co.* v. *Boston*, 371 Mass. 341, 344 (1976), in which we construed a statutory provi-

---

[5]The city solicitor informed Park Drive that its request would be reconsidered once it acquired the tow trucks necessary to perform the work.

[6]The defendants also cite §§ 3.04.100 and 3.04.110 of the Revere Revised Ordinances, which govern municipal contracts and in addition require that all such contracts be filed with the city auditor and city clerk. General Laws c. 43, § 29, is explicitly referenced in § 3.04.100.

[7]We have also held that a party cannot evade the statutory limitations on a municipality's contracting power by rendering services and subsequently seeking recovery based on alternative theories. See *United States Leasing Corp.* v.

sion analogous to G. L. c. 43, § 29, we described these require-
ments as "elements, fixed by statutes, which were essential
. . . to the formation of a contract casting liability on the city."
See *Urban Transp., Inc.* v. *Mayor of Boston*, 373 Mass. 693,
696 (1977) ("A contract with the city is not formed until the
necessary statutory requirements are fulfilled"). We have
insisted on "precise[]" compliance with these requirements,
*United States Leasing Corp.* v. *Chicopee, supra* at 232, and the
party seeking recovery bears the burden of proving such
compliance. *Richard D. Kimball Co.* v. *Medford, supra* at 729.

The specific requirements here at issue are not "mere ministe-
rial" formalities, see *Urban Transp., Inc.* v. *Mayor of Boston,
supra* at 697, but rather serve important public purposes. Among
other things, they "limit the power of public officials in making
contracts . . . so as to unify the control of the city's com-
mercial transactions" (citations omitted), *id.*, thus "placing cit-
ies and towns on a sound financial basis and preventing waste,
fraud, and abuse." *United States Leasing Corp.* v. *Chicopee, su-
pra* at 231.[8] In other words, the purpose of requiring a written
contract, with the signatures of certain city officials affixed
thereto, is to attach a "paper trail" to the city's contractual
commitments that is capable of being scrutinized by the public,
and for which municipal officials are ultimately accountable.[9]

In this case, the requirements of G. L. c. 43, § 29, were not
met, and the purposes behind the statute were frustrated. It is
undisputed that no written agreement existed and that the
requisite written approval was absent.[10] Therefore, inquiring
whether the city breached a contract is pointless, because no

---

*Chicopee*, 402 Mass. 228, 231-232 (1988), and cases cited (estoppel); *Adalian Bros.* v. *Boston*, 323 Mass. 629, 632 (1949) (implied contract); *Lowell* v. *Massachusetts Bonding & Ins. Co.*, 313 Mass. 257, 272 (1943) (quantum meruit).

[8] The legislative history of G. L. c. 43 suggests that a principal motivation for its passage was the belief that "city officials should be prohibited from participating in the making of contracts of all descriptions in cases where they have prominent connections with the contractors." Report of the Joint Special Committee on City Charters, 1915 Senate Doc. No. 254, at 20.

[9] Another important purpose of statutes such as G. L. c. 43, § 29, is to limit a municipality's exposure if it is sued under a contract. See *McGovern* v. *Boston*, 229 Mass. 394, 397 (1918).

[10] It has been suggested that because many contracts between Massachusetts municipalities and towing companies are unwritten the agreement here should

enforceable contract existed. See *id.* at 231-232.

Park Drive argues, however, that by its own terms G. L. c. 43, § 29, does not apply to this case, because Park Drive's arrangement with the city was not one "where the amount involved [was] five thousand dollars or more." Park Drive suggests that we should construe "amount involved" to refer only to cases that involve the "obligation, appropriation, or expenditure of municipal funds." This reading of the statute would exclude the present situation, because the only money that changed hands between the parties were the administrative fees, which were not expended *by* the city but paid *to* the city. We do not agree with Park Drive's interpretation.[11]

We have stated that such statutes are broadly phrased and are of general application. *Adalian Bros.* v. *Boston*, 323 Mass. 629, 631 (1949). See *Lumarose Equip. Corp.* v. *Springfield*, *supra* at 519. Further, the plain language of G. L. c. 43, § 29, simply does not contain the restriction with which Park Drive wishes to burden it. We construe the phrase "amount involved" to be intentionally imprecise, and conclude that it refers to the value to the contractor, no matter the source. This interpretation is consistent with the statute's general purposes; the public's interest in the transparency of municipal contracting is no less important simply because money is not paid directly from the city treasury to the contractor. Rather, contracts at or above the minimum five thousand dollar value, however measured, and whichever way the money flows, are considered significant enough to warrant the formalities required by the statute.

Park Drive's claim of unfair or deceptive acts or practices in violation of G. L. c. 93A, § 11,[12] is derivative of its breach of contract claim, in that it alleges "unfair and deceptive conduct

---

be enforced. The fact that many of these agreements are not in writing does not alter our analysis. On the contrary, it confirms that G. L. c. 43, § 29, is as relevant and necessary today as when it was originally enacted.

[11]In support of its argument, Park Drive notes that our prior cases construing G. L. c. 43, § 29, or analogous statutes and ordinances, have dealt with arrangements that involve the expenditure, obligation, or appropriation of funds but never with an arrangement whereby the contractor is paying funds to the city. However, our prior cases have not restricted the applicability of G. L. c. 43, § 29, so as to exclude this type of arrangement.

[12]General Laws c. 93A, § 11, provides, in pertinent part, that "[a]ny person who engages in the conduct of any trade or commerce and who suffers any

surrounding the breach of contract." In light of our conclusion that no contract existed between the parties, this claim must also fail. Moreover, although no case has presented us with an occasion to decide whether a municipality may in some circumstances be "amenable to the provisions" of G. L. c. 93A, our cases are clear that a municipality is not liable under G. L. c. 93A when it is not "acting in a business context," that is, when it is not engaged in "trade or commerce." *All Seasons Servs., Inc.* v. *Commissioner of Health & Hosps. of Boston*, 416 Mass. 269, 271 (1993), quoting *Lantner* v. *Carson*, 374 Mass. 606, 611 (1978). See *Boston Hous. Auth.* v. *Howard*, 427 Mass. 537, 538-539 (1998); *United States Leasing Corp.* v. *Chicopee, supra* at 232. Whether a municipality is acting in a business context depends on "the nature of the transaction, the character of the parties involved and [their] activities . . . and whether the transaction [was] motivated by business . . . reasons." *Boston Hous. Auth.* v. *Howard, supra* at 538, quoting *Begelfer* v. *Najarian*, 381 Mass. 177, 190-191 (1980). Furthermore, a party is not engaging in "trade or commerce" as defined by G. L. c. 93A when its actions are motivated by legislative mandate. *Lafayette Place Assocs.* v. *Boston Redevelopment Auth.*, 427 Mass. 509, 535 (1998), cert. denied, 525 U.S. 1177 (1999); *Peabody N.E., Inc.* v. *Marshfield*, 426 Mass. 436, 439-440 (1998). Here, the city's participation in the transaction was merely incidental to its primary function of maintaining public order in the streets, see *All Seasons Servs., Inc.* v. *Commissioner of Health & Hosps. of Boston, supra* at 271, and the regulation of illegally parked vehicles has been assigned to the city by statute. G. L. c. 40, § 21.[13]

*Judgments affirmed.*

---

loss of money or property . . . as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice . . . may . . . bring an action in the superior court . . . ."

[13]General Laws c. 40, § 21, authorizes municipalities, inter alia, to regulate parking, the leaving of vehicles in private ways, and the removal and storage of vehicles that interfere with snow plowing, garbage collection and parking spaces reserved for handicapped persons.