# United States Court of Appeals
## For the First Circuit

No. 22-1117

ANTHONY GATTINERI,

Plaintiff, Appellant,

v.

WYNN MA, LLC; WYNN RESORTS LIMITED,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, Chief U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Gelpí, Circuit Judges.

Stephen F. Gordon, with whom Todd B. Gordon, Robert A. DiSorbo, Kevin A. Robinson, and The Gordon Law Firm LLP were on brief, for appellant.

Samuel M. Starr, with whom Caitlin A. Hill and Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C. were on brief, for appellees.

February 20, 2024

**GELPÍ**, **Circuit Judge**. Appellant Anthony Gattineri ("Gattineri") brought this action against Appellees Wynn MA, LLC, and Wynn Resorts, Limited (collectively, "Wynn"), alleging breach of contract, common law fraud, and unfair and/or deceptive trade practices in violation of Mass. Gen. Laws. ch. 93A, § 2(a). Wynn moved for summary judgment, which the United States District Court for the District of Massachusetts granted on all counts in favor of Wynn. Gattineri appealed. Recognizing that Gattineri's claims hinge on important questions of Massachusetts law and public policy, we certified two questions to the Massachusetts Supreme Judicial Court ("SJC"), see Gattineri v. Wynn MA, LLC, 63 F.4th 71 (1st Cir. 2023). The SJC issued an opinion responding to our questions, see Gattineri v. Wynn MA, LLC, 221 N.E.3d 742 (Mass. 2023), after which the parties filed supplemental briefs addressing the resolution of this appeal in light of the SJC's opinion. For the reasons below, we now affirm the district court's grant of summary judgment on the grounds provided by the SJC.

## I. BACKGROUND

### A. Relevant Facts

The facts are set out in our prior opinion, Gattineri, 63 F.4th, and in the SJC's opinion, Gattineri, 221 N.E.3d. We set forth in greater detail certain facts we find particularly relevant. The story begins with an Option Agreement for the purchase of a parcel of land (the "Parcel") in Everett and Boston,

Massachusetts, for the construction of the Encore Boston Harbor resort and casino, owned by Wynn. The Option Agreement, entered into in December 2012 between Encore and FBT Realty, LLC ("FBT"), of which Gattineri is a 46.69% owner, gave Encore the option to purchase the Parcel from FBT for $75 million. In January 2013, Encore filed an application with the Massachusetts Gaming Commission ("Commission") for a gaming license to operate a casino in Massachusetts, as required by state law. Thereafter, the Commission's Investigation and Enforcement Bureau ("IEB") conducted a suitability investigation of each applicant for the gaming license, including Encore and Wynn.

During the licensing process, the Commission had reason to become concerned about whether an organized crime figure, through Gattineri, was part of FBT's membership makeup at the time of the Option Agreement. In 2009 and 2010, Charles Lightbody ("Lightbody"), a convicted felon and associate of La Cosa Nostra, was one of the owners of record of FBT. FBT and Gattineri represented to the Commission that, at the time of the 2012 execution of the Option Agreement, FBT was owned only by Gattineri, Dustin DeNunzio, and Paul Lohnes. Yet, in December 2012, in a recorded prison phone call, Lightbody referenced his ownership interest or control of the Parcel and the need to conceal it from the Commission. And in July 2013, Gattineri had told the police

- 3 -

that he owed Lightbody "like, a million," and said, "If I don't pay him, he can take it away from me."

The Commission informed Wynn of its concerns about undisclosed interests in FBT so that Wynn could address them. In response to the Commission's concerns, in November 2013, Encore and FBT entered into a Ninth Amendment to the Option Agreement, reducing the purchase price for the Parcel to $35 million, a figure that reflected the fair market value of the Parcel assuming that it would not be used for gaming purposes. The Commission subsequently approved the Ninth Amendment. Such approval, however, was conditioned on the purchase price not exceeding $35 million and the requirement that the three publicly known members of FBT sign a certification stating that they were the exclusive recipients of the sale proceeds. As the SJC made clear, "Gattineri was [] a person of particular interest to the commission, as he not only was one of the three principals of FBT but had also bought out the convicted felon's ownership interest in FBT and still owed him money at the time of the investigation" into the possibility of concealed ownership interests by the convicted felon. Gattineri, 221 N.E.3d at 744. While DeNunzio and Lohnes signed the certificates, Gattineri repeatedly refused to do so unless he was given what he contended was his share of the price reduction required by the Commission.

- 4 -

The Commission also directed the IEB to deliver its files to the U.S. Attorney, the Attorney General of Massachusetts, and the district attorney for Suffolk County. As the SJC noted, Gattineri was indicted in federal court and arraigned on state court criminal proceedings.[1]  Id. at 747.

Gattineri's arguments, including as to his Chapter 93A claim, purport to be based on the very actions Wynn took to respond to the Commission's concerns, including his dealings with the three prosecutors. Throughout these events, as detailed by the SJC, Wynn was under a continuing duty to provide assistance and information required by the Commission and to cooperate in any inquiry or investigation by the Commission. See id. at 750.

On June 14, 2014, Gattineri met with Robert DeSalvio, Senior Vice President of Development of Wynn Resorts Development, LLC, in San Diego, California. Gattineri alleges that, at the meeting, the two orally agreed to the following: "If Anthony Gattineri signed the required certificate and Wynn obtained the casino license for a casino on the [Parcel], Wynn would make Anthony Gattineri whole" (an alleged contract we term the "San Diego Agreement"). Per Gattineri, "mak[ing him] whole" would involve Wynn paying him approximately $19 million, calculated as

---

[1]  After the events which led to this suit, Gattineri was acquitted of the federal charges and the state charges were dismissed.

- 5 -

Gattineri's proportional share of the $40 million purchase price reduction.  The San Diego Agreement was neither put in writing nor communicated to the Commission.  That same day, Gattineri signed the required certification.

In September 2014, the Commission granted Encore the gaming license.  Encore subsequently purchased the Parcel for $35 million.  Gattineri was not paid the additional $19 million.

## B. Procedural History

In June 2018, Gattineri filed this action against Wynn in the United States District Court for the District of Massachusetts, alleging (1) breach of contract, (2) common law fraud, and (3) unfair and/or deceptive trade practices in violation of Mass. Gen. Laws. ch. 93A, § 2(a).  Wynn sought summary judgment, which the district court granted on all counts in favor of Wynn, concluding that (1) the San Diego Agreement is an "unenforceable illegal contract" under Mass. Gen. Laws ch. 23K; (2) an essential term of the San Diego Agreement -- the amount that Gattineri would be paid in exchange for his signature -- was too indefinite and uncertain to form a valid contract; (3) Gattineri's claimed reliance on Wynn's representations was too unreasonable, foreclosing a claim for common law fraud; and

(4) Gattineri's Chapter 93A claim was barred because it is "wholly derivative" of his breach of contract and common law fraud claims.

Gattineri appealed, requesting reversal based on an alleged taint caused by ex parte communication between the district court courtroom clerk and Wynn's counsel. Gattineri further argued that the district court erred in granting Wynn's motion for summary judgment because (1) the San Diego Agreement does not violate Mass. Gen. Laws ch. 23K; (2) even if the San Diego Agreement did violate Mass. Gen. Laws ch. 23K, it should still be enforced because the parties are not in pari delicto; (3) the terms of the San Diego Agreement are sufficiently definite and certain; (4) Gattineri's reliance on Wynn's alleged promise to make him whole was reasonable; and (5) Gattineri's Chapter 93A claim is not wholly derivative of his breach of contract and common law fraud claims.

In our earlier disposition of this appeal, we rejected Gattineri's improper ex parte communication claim and in pari delicto argument, and we concluded that there are genuine disputes of material facts related to Gattineri's breach of contract and common law fraud claims. Gattineri, 63 F.4th at 83. We then determined that the success of Gattineri's claims hinges on whether the San Diego Agreement is unenforceable as contrary to state law

and/or as a violation of public policy.  Id.  Thus, we certified

the following two questions to the SJC:

> 1) Is the San Diego Agreement unenforceable
> because it violates Section 21 of the Gaming
> Act?[2]
>
> 2) If not, is the San Diego Agreement
> unenforceable for reasons of public policy of
> ensuring public confidence in the integrity of
> the gaming licensing process and in the strict
> oversight of all gaming establishments through
> a rigorous regulatory scheme?

Id. at 95.

On November 3, 2023, the SJC issued its opinion, see

Gattineri, 221 N.E.3d.[3]  The SJC held:

> An agreement, concealed from the commission
> empowered to review and approve casino
> licenses, and inconsistent with the terms
> presented to, and approved by, the commission
> to address its concerns about the possible
> involvement of organized crime, is
> unenforceable as a violation of public policy.
> Because we hold that the San Diego agreement
> is unenforceable for public policy reasons, we
> need not and do not answer the first question,
> regarding whether it also violates § 21 of the
> [G]aming [A]ct.

Id. at 752.  We then ordered the parties to file supplemental

briefs addressing the resolution of this appeal in light of the

SJC's opinion.  Applying the SJC's response and considering the

---

[2] Mass. Gen. Laws. ch. 23K, § 21.

[3] We thank the SJC for its prompt answers to our certified
questions.

parties' supplemental briefs, we now address the merits of Gattineri's appeal.

## II. DISCUSSION

### A. Standard of Review

"We review a district court's grant of summary judgment de novo[.]" Triangle Cayman Asset Co. v. LG & AC, Corp., 52 F.4th 24, 32 (1st Cir. 2022) (citations omitted). Summary judgment "is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)) (citing Modeski v. Summit Retail Sols., Inc., 27 F.4th 53, 56 (1st Cir. 2022)).

### B. Breach of Contract and Common Law Fraud

Neither party disputes that the legality of the San Diego Agreement is dispositive of Gattineri's breach of contract and common law fraud claims. The SJC has now opined that the San Diego Agreement is unenforceable on public policy grounds. See Gattineri, 221 N.E.3d at 744. In reaching this conclusion, the SJC "recognized that the legalization and regulation of gambling are among the Legislature's core police powers, given the risks associated with gambling operations." Id. at 748 (first citing Abdow v. Att'y Gen., 11 N.E.3d 574, 583-84 (Mass. 2014); and then citing Selectmen of Topsfield v. State Racing Comm'n, 86 N.E.2d 65, 70 (Mass. 1949)). Indeed, "[w]here gambling has been legalized, the Legislature has strictly regulated it, giving

- 9 -

administrative agencies broad powers to oversee its licensing and operation to protect the public interest." Id. (citations omitted). Importantly, the text of the Gaming Act is reflective of this, as it states that "ensuring public confidence in the integrity of the gaming licensing process and in the strict oversight of all gaming establishments through a rigorous regulatory scheme is the paramount policy objective of [the Gaming Act]." Mass. Gen. Laws. ch. 23K, § 1(1) (emphasis added); Gattineri, 221 N.E.3d at 748.

As the SJC observed, the Gaming Act directs the Commission to "assure . . . that there shall be no material involvement directly or indirectly with . . . a gaming operation or the ownership thereof, by unqualified, disqualified or unsuitable persons or by persons whose operations are conducted in a manner not conforming with [the Gaming Act]." Mass. Gen. Laws. ch. 23K, § 4(9); Gattineri, 221 N.E.3d at 749. The Commission can thus "require a person who has a business association of any kind with a gaming licensee or applicant to be qualified for licensure under [the Gaming Act]." Mass. Gen. Laws. ch. 23K, § 4(11); Gattineri, 221 N.E.3d at 749. And, in the Commission's investigation into the qualifications and suitability of applicants and those who are required to be qualified for licensure, the concealing of information relevant to that inquiry

- 10 -

is strictly prohibited.  See Mass. Gen. Laws. ch. 23K, § 13(c);
Gattineri, 221 N.E.3d at 749.

These requirements, "designed to develop a thorough understanding of the applicants and their associates to ensure the integrity of the gambling license and operation," Gattineri, 221 N.E.3d at 750, are pertinent to Gattineri's Chapter 93A claim.

The SJC determined that "Gattineri's interest in the property and the price he would receive for it were therefore well within the regulatory powers of the commission." Id. at 750. Because of that, "any additional contract involving Gattineri's compensation should have been presented to the commission by Wynn or Gattineri himself." Id. Accordingly, the SJC concluded that "the enforcement of any contracts concealed from the commission and compensating Gattineri for his interest in the property would be a violation of public policy." Id.

The SJC further determined that "[s]ecret deals in violation of the public terms and conditions required for gaming licensure are unenforceable violations of public policy," for "[t]hey place in grave doubt the integrity of the public process for awarding the license, and thereby defeat the public's confidence in that process." Id. at 751 (first citing Mass. Gen. Laws ch. 23K § 1(1); then citing Abdow, 11 N.E.3d at 574; and then citing Colella v. State Racing Comm'n, 274 N.E.2d 331, 335-36 (Mass. 1979)).  Thus, as a separate basis for its conclusion that

- 11 -

the alleged San Diego Agreement is unenforceable for public policy reasons, the SJC pointed to the fact that such agreement was not only concealed from the Commission, but was also inconsistent with the publicly disclosed terms and conditions upon which the sale of the Parcel had been approved, namely the $35 million cap on the purchase price, which represented the "[C]ommission's commitment to preventing any persons with connections to organized crime from profiting from the awarding of the license" and was "necessary to promote public confidence in the integrity of the deal." See id. at 750-51.

Because the alleged San Diego Agreement violates public policy, Gattineri's breach of contract and common law fraud claims cannot move forward. Accordingly, we affirm the district court's entry of summary judgment as to these claims on the grounds provided by the SJC.

## C. Chapter 93A

We next turn to whether Gattineri's claim that Wynn violated Chapter 93A of the Massachusetts General Laws survives after the SJC's decision. The district court granted summary judgment in favor of Wynn as to this claim on the ground that "the Chapter 93A claim derives entirely from the same set of facts" as Gattineri's breach of contract and common law fraud claims. In our earlier disposition of this appeal, we explained that "because whether the alleged contract is unenforceable affects [Gattineri's

- 12 -

Chapter 93A claim], we [would] await the SJC's answer to our [certified] questions before addressing it in full." Gattineri, 63 F.4th at 89.

Gattineri contends that the SJC's opinion does not dispose of his Chapter 93A claim. Specifically, Gattineri argues that his Chapter 93A claim is not wholly derivative of his breach of contract and common law fraud claims and does not turn on whether the San Diego Agreement is an enforceable contract. Not so. The Chapter 93A claim is derivative, as the district court correctly held, and is not a plausible ground for relief in light of the SJC's opinion. Indeed, the Chapter 93A claim seeks the same amount of damages as his claim for damages for his breach of contract claim, trebled as provided for by Chapter 93A. And it describes a course of conduct by the defendants identical to that supporting the breach of contract and common law fraud claims, all described in the SJC's decision.

Chapter 93A of the Massachusetts General Laws prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws. ch. 93A, § 2(a). Such a claim "requires a showing of conduct that (1) falls within 'the penumbra of some common-law, statutory, or other established concept of unfairness'; (2) is 'immoral, unethical, oppressive, or unscrupulous'; and (3) causes 'substantial injury to [consumers or other businesspersons].'" Jasty v. Wright Med. Tech., Inc., 528

- 13 -

F.3d 28, 37 (1st Cir. 2008) (alteration in original) (quoting Serpa Corp. v. McWane, Inc., 199 F.3d 6, 15 (1st Cir. 1999)).

The SJC has clearly articulated the standard that if a Chapter 93A claim is "derivative of" other claims which fail as a matter of law, the Chapter 93A claim "must also fail." See Park Drive Towing, Inc. v. City of Revere, 809 N.E.2d 1045, 1050-51 (Mass. 2004). Applying that principle in Park Drive Towing, the SJC affirmed the dismissal of a Chapter 93A claim, reasoning that it was derivative of a breach of contract claim in that it "allege[d] 'unfair and deceptive conduct surrounding the breach of contract.'" Id. at 1049-51. Because the claim for breach of contract failed, as "no enforceable contract existed" between the parties, so did the Chapter 93A claim. Id. Similarly, and by analogy, the SJC held in Iannacchino v. Ford Motor Co., 888 N.E.2d 879 (Mass. 2008) that dismissal of the plaintiffs' Chapter 93A claim, which had failed to properly allege that vehicles sold by the defendants did not comply with relevant federal safety standards, also "warrant[ed] dismissal of the[ir] breach of implied warranty [of merchantability] claim." Id. at 889. That was so because the claims were "based on the same economic theory of injury and the same set of alleged facts," such that they were "interconnected" and "factually and legally intertwined." Id.; see Lily Transp. Corp. v. Royal Institutional Servs., Inc., 832 N.E.2d 666, 686 (Mass. App. Ct. 2005) (Laurence, J., concurring in

- 14 -

part and dissenting in part) (stating that when a Chapter 93A claim is "based solely on an underlying but meritless claim for common-law fraud," the Chapter 93A claim "is itself without merit"); Priv. Lending & Purchasing, Inc. v. First Am. Title Ins. Co., 766 N.E.2d 532, 538 (Mass. App. Ct. 2002) (affirming dismissal of Chapter 93A claim that "rest[ed] entirely upon . . . [failed] contract and negligent misrepresentation claims"); Macoviak v. Chase Home Mortgage Cory., 667 N.E.2d 900, 904 (Mass. App. Ct. 1996) (finding Chapter 93A claim to be "without merit" where it was "solely based upon . . . underlying claim for common law fraud" which fail[ed] as a matter of law); Fernandes v. Rodrigue, 646 N.E.2d 414, 416 (Mass. App. Ct. 1995) (holding that Chapter 93A claim was "absorbed in and vanishe[d] with the [negligent] misrepresentation claim" in case where property purchasers sued vendors for allegedly misrepresenting acreage of land parcel).

This court too has applied Massachusetts law and found that a Chapter 93A claim that is derivative of other failed claims must be dismissed. See FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 108 (1st Cir. 2009) (holding that where Chapter 93A claim "is based wholly on [] common-law claims" and those "underlying claims fail," the Chapter 93A claim also fails); see also Whitman & Co., Inc. v. Longview Partners (Guernsey) Ltd., No. 14-cv-12047-ADB, 2015 WL 4467064, at *7 (D. Mass. July 20, 2015) ("Chapter 93A claims derivative of the [failed] breach of contract

- 15 -

claim are also barred."); Pimental v. Wachovia Mortg. Corp., 411 F. Supp. 2d 32, 40 (D. Mass. 2006) ("Since [the plaintiff] has failed to allege sustainable breach of contract or negligence claims, and the Chapter 93A claim is based upon the previous two claims, there is no basis for finding [the defendant] liable under Chapter 93A."). This rule applies here.

Gattineri contends that we should read his "[Chapter] 93A claim [as being] broader than just Wynn's 'breach' of the San Diego Agreement or the facts underlying the [common law] fraud claim." This argument likewise fails. In his breach of contract claim, Gattineri alleges that "Wynn has refused to honor its contract, the San Diego Agreement, with [him] and intends to keep for itself the already received benefits of its contract with [him]." In his common law fraud claim, Gattineri alleges that "Wynn instructed Mr. DeSalvio to fly to San Diego to meet with [] Gattineri and authorized him to offer anything necessary and to make any agreement necessary to obtain [] Gattineri's signature," and that "Wynn never had any intention of honoring any agreement that was reached with [] Gattineri." And, "[b]ecause the Chapter 93A claim centers on the same alleged misconduct [as the breach of contract and common law fraud claims], it is merely derivative of [such claims]." 4MVR, LLC v. Hill, No. 12-cv-10674, 2015 WL 3884054, at *8 (D. Mass. June 24, 2015); see also Lily Transp.

- 16 -

Corp., 832 N.E.2d at 686 (Laurence, J., concurring in part and dissenting in part); FAMM Steel, 571 F.3d at 108.

Indeed, Gattineri himself has admitted in the summary judgment filings that his Chapter 93A claim is based upon Wynn's alleged interference with the San Diego Agreement. Wynn put into the summary judgment record, without objection from Gattineri, that in April 2018 Gattineri sent a demand letter to Wynn demanding that "Wynn respond to its violation of Chapter 93A by meeting its obligations under [the San Diego Agreement]."[4] In the letter, Gattineri alleged that "Wynn ha[d] failed and refused to pay or otherwise provide value of $18,676,000 to [him] and unfairly and/or deceptively continue[d] to withhold $18,676,000 from him." Notably, Gattineri stated that "[i]t has become obvious that, in a demonstrably unfair and/or deceptive trade practice, Wynn intends to keep for itself the already received benefits of [the San Diego Agreement] . . . but does not intend to live up to its obligations under [such agreement]." Importantly, Gattineri has done nothing to contest or refute this admission from his demand

---

[4] Under Section 9 of Chapter 93A, a plaintiff must send the prospective defendant a demand letter "identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered." Mass. Gen. Laws ch. 93A, § 9(3). If, however, the Chapter 93A claim arises under Section 11 instead of Section 9, "a demand letter is not required." Rhodes v. Ocwen Loan Servicing, LLC, 44 F. Supp. 3d 137, 140 n.3 (D. Mass. 2014). Here, while Gattineri's Chapter 93A claim arises under Section 11 and thus he was not required to deliver a demand letter, Gattineri still sent such a letter to Wynn.

letter that his Chapter 93A claim is in fact based upon Wynn's interference with the San Diego Agreement.

As Gattineri concedes, his breach of contract and common law fraud claims fail in light of the SJC's opinion. Consequently, Gattineri "has no reasonable expectation of proving a violation of [Chapter] 93A." Macoviak, 667 N.E.2d at 904. In other words, because of the unenforceability of the San Diego Agreement by reason of public policy, "it is clear that [Gattineri cannot] show[] the conduct complained of [in his Chapter 93A claim] fell within any common-law, statutory, or other established concept of unfairness." FAMM Steel, Inc., 571 F.3d at 108. We also reject, as contrary to both the facts of record and the law, Gattineri's argument that even if the San Diego Agreement was illegal and unenforceable, he could not have known of any illegality, whereas Wynn could.

Thus, because Gattineri's Chapter 93A claim is "derivative of [his] breach of contract" and fraud claims, "in that it alleges 'unfair and deceptive conduct surrounding the breach of contract,' . . . this claim must also fail." See Park Drive Towing, Inc., 809 N.E.2d at 1050. The district court's grant of summary judgment on the same is affirmed.

### III. CONCLUSION

For the foregoing reasons, we **affirm**. Each party will bear its own costs.

- 18 -